2015 IL App (1st) 142785
Fifth Division
September 30, 2015

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| RAYMOND THOMAS, | ) | |
| | ) | |
| | ) | Appeal from the Circuit Court |
| Plaintiff-Appellant and Cross-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 07 L 13563 |
| | ) | |
| WEATHERGUARD CONSTRUCTION COMPANY, INC., | ) | The Honorable |
| | ) | Joan E. Powell, |
| | ) | Judge Presiding. |
| Defendant-Appellee and Cross-Appellant. | ) | |
| | ) | |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Lampkin and Palmer concurred in the judgment and opinion.

**OPINION**

¶ 1   The instant consolidated appeals arise from the trial court's finding, after a bench trial, that defendant Weatherguard Construction Company, Inc., was plaintiff Raymond Thomas' employer and owed plaintiff commissions on contracts that plaintiff procured on Weatherguard's behalf. Weatherguard appeals the trial court's finding that it was plaintiff's employer, as well as the court's findings concerning damages. Plaintiff appeals the trial court's application of the Wage Payment and Collection Act (Wage Payment Act) (820 ILCS 115/1 *et seq.* (West 2014)) as of the time of the filing of his complaint, instead of the application of the amended Wage Payment Act, which was in force at the time of the court's

judgment. For the reasons that follow, we affirm the trial court's judgment in plaintiff's favor but remand the case to the trial court for the limited purpose of determining plaintiff's reasonable attorney fees.

¶ 2                                                    BACKGROUND

¶ 3          On December 5, 2007, plaintiff filed a complaint against defendant; the complaint was amended on July 14, 2008, and it is the amended complaint on which the parties went to trial. The amended complaint contains four counts, and alleges that defendant is in the business of repairing and replacing roofs, siding, doors, and windows for homes that sustained damage due to weather conditions. The complaint alleges that "[o]n or around April 7, 2007, Defendant hired Plaintiff as a commissioned sales representative to solicit orders (contracts) for repair work for and on behalf of Defendant" and "promised to pay Plaintiff commissions equal to twenty percent (20%) of the total value of any orders (contracts) that Plaintiff secured for and on behalf of Defendant." The complaint alleges that plaintiff performed to the "reasonable satisfaction" of defendant and that plaintiff terminated his employment on July 9, 2007, after having secured orders in the amount of $245,010.57. The complaint alleges that based on this amount, plaintiff was entitled to commissions of $49,002.11, but was only paid $1,335.57. Plaintiff sent defendant a letter demanding payment of the unpaid commissions on September 4, 2007, but defendant refused to pay.

¶ 4          Count I of the complaint alleges that defendant violated the Sales Representative Act (820 ILCS 120/1 *et seq.* (West 2008)), which requires a principal to pay a sales representative earned commissions within 13 days after the sales representative's termination of employment. Count I requested that the court award plaintiff all unpaid earned

commissions, as well as "exemplary damages equal to three (3) times the total amount of the unpaid earned commissions" and attorney fees.

¶ 5 Count II, pled in the alternative, alleges that defendant violated the Wage Payment Act, which required an employer to pay an employee final compensation at the time of the employee's separation from employment or at the next regularly scheduled pay period. Count II requested that the court award plaintiff all unpaid final compensation, as well as attorney fees pursuant to the Attorneys Fees in Wage Actions Act (705 ILCS 225/0.01 *et seq.* (West 2008)).

¶ 6 Count III, pled in the alternative, was for breach of contract and alleges that defendant breached its oral contract with plaintiff by failing to compensate him as agreed. Count III requested that the court award plaintiff $47,666.54 in unpaid compensation.

¶ 7 Finally, count IV, pled in the alternative, was based on unjust enrichment and alleges that defendant was being unjustly enriched by receiving payment for service contracts that plaintiff solicited and secured while not paying plaintiff compensation. Count IV requested that the court award plaintiff $47,666.54 in unpaid compensation, as well as punitive damages and attorney fees.

¶ 8 In its answer, defendant denied plaintiff was its employee, denied any business relationship with plaintiff, and denied that it owed plaintiff any commissions.

¶ 9 On June 12, 2010, defendant filed a motion for summary judgment, claiming it owed no liability to plaintiff because the Sales Representative Act did not apply to defendant. Additionally, defendant argued that it was not plaintiff's employer, claiming plaintiff was employed by Dave Farbaky and his company DBar, an independent marketing company.

¶ 10     On September 15, 2010, the trial court granted defendant's motion for summary judgment as to count I of plaintiff's amended complaint, concerning the Sales Representative Act, and denied the motion as to the other counts of the amended complaint.

¶ 11     On June 28 and 29, 2011, the parties appeared before the court for a bench trial. Plaintiff testified on his own behalf that in 2007, he came across an ad by defendant on the Career Builder website; the ad contained defendant's name with no mention of Dave Farbaky or DBar. He submitted an online application, along with his resume, and received a call "from someone from the office for an interview." The building at which he interviewed had defendant's name on it and plaintiff did not observe DBar's name anywhere. When plaintiff walked into the building he observed "several employees that had, like, [defendant's] uniforms and stuff on."

¶ 12     Plaintiff testified that he was interviewed by Farbaky, who was wearing a Weatheguard uniform. Plaintiff also spoke to Chad Hagen, who was also wearing a Weatherguard uniform. Plaintiff received a business card from Hagen at the same time, which had defendant's name on it. After the interview, plaintiff received a call back from Farbaky, inviting plaintiff back to the office. When plaintiff returned to the office, he was invited on a "ride-along" with Farbaky to observe what the job entailed. Farbaky took plaintiff to customers' homes and informed plaintiff "about the company." Plaintiff had the opportunity to perform a roof inspection with Farbaky, who showed plaintiff the process of approaching the customer and inspecting the roof for damage. Plaintiff observed Farbaky ring a prospective customer's doorbell and heard him state that "he was from Weatherguard Construction" and that they were in the area inspecting roofs for hail damage. Plaintiff further observed Farbaky inform the customer that if they observed damage on the roof, the customer could fill out

defendant's claim form and possibly qualify for a replacement roof. Once the form was completed, an insurance adjuster would set up an appointment with defendant to inspect the site and verify defendant's report of damage. Once the insurance adjuster approved it, the customer would be paid by the insurance company for the damage to the roof under the customer's insurance policy. The customer would then pay defendant to perform the roof repairs.

¶ 13    After the ride-along, plaintiff called Farbaky and informed him that plaintiff "accepted, you know, the position of coming aboard as far as being a claims specialist for Weatherguard." Plaintiff was given a map of the geographic territory, as well as a Weatherguard hat and a Weatherguard jacket. Farbaky also provided plaintiff a script to read in which plaintiff would identify himself as being " 'from Weatherguard Construction Company.' "

¶ 14    In May 2007, Farbaky handed plaintiff a business card, which had the Weatherguard name on it. At approximately the same time, plaintiff received business cards with plaintiff's name on them; those business cards also had the Weatherguard name on it. Farbaky also applied for a solicitor's permit on plaintiff's behalf with the City of Naperville. Plaintiff explained that the permit "allow[ed] Weatherguard employees" to solicit business in Naperville. Plaintiff further testified that Farbaky arranged for Weatherguard logos to be placed on the sides of plaintiff's personal vehicle.

¶ 15    Plaintiff testified that after accepting the job, he began going out into his territory every day and approaching customers. If he obtained a contract with a customer, he would either bring a copy of the contract back to the office or would hand it to Farbaky if he was in the

area. Plaintiff would then be contacted when the insurance adjuster was going to be at the home so that plaintiff could be present for the inspection.

¶ 16    After approximately two weeks of work, plaintiff "started kind of feeling like [he had] a kind of like suspicion about the company." Upon beginning work, plaintiff "was expected to be paid 20 percent of the total job," based on his conversations with Farbaky. When he received his first paycheck, it was a personal check from Farbaky with the word " 'draw' " written on the memo line. Plaintiff was "in disbelief" that he was receiving a personal check and asked Farbaky about it. Plaintiff was told that the term " 'draw' " meant that the check was "[j]ust money being paid up front until [plaintiff] actually got the dollar amount that was due [to him] from the jobs that [he] got." Plaintiff continued to receive regular personal checks from Farbaky with the word " 'draw' " written on the memo line. Plaintiff never received a payroll check from Farbaky and never received any checks from defendant. Plaintiff received a total of $2,900 in personal checks.

¶ 17    As time passed and plaintiff had not received any checks from defendant, he "wasn't feeling *** real [*sic*] good about the company," but continued working for several months. However, plaintiff was then offered a full-time job as a store manager at Lowe's and plaintiff decided to accept that position. Plaintiff testified that he worked for a total of three months procuring contracts for defendant. During the month of April 2007, he worked 10 hours per day; during May and June, he was involved in store manager training at Lowe's and spent approximately four to five hours a day procuring contracts for defendant. Plaintiff stopped procuring contracts in July.

¶ 18    Plaintiff identified an exhibit that was admitted into evidence as a listing of all homeowners whose contracts plaintiff had procured for defendant. In each instance, plaintiff

had obtained the customer's signature on the contract, had turned the contract in to defendant, and had met with the insurance adjuster to inspect the damage. The list included the contract price for each of the contracts, which plaintiff testified was a combination of plaintiff's own estimate as to the dollar value of the contract and what plaintiff had learned about the contract's value from insurance adjusters.

¶ 19　　　　On cross-examination, plaintiff testified that Farbaky assigned plaintiff the area in which plaintiff worked and that he never spoke with Brett or Matt MacDonald. Plaintiff never received a paycheck, W-2, or 1099 from defendant and never completed a W-4 for defendant. Plaintiff also testified that he did not have any documentation to support the prices listed on the exhibit.

¶ 20　　　　On redirect examination, plaintiff testified that he and Farbaky had discussed plaintiff's compensation and that "[plaintiff] was told by Dave that each contract would be 20 percent of the total job." Farbaky and plaintiff "talked about a salary in excess of a six figure salary, talked about 100,000-plus just based off of the commission that you would get for each job." Plaintiff testified that when he first met Farbaky, Farbaky told him that his title was a "[f]ield supervisor" and that his supervisor was Chad Hagen. Farbaky told plaintiff that he worked for defendant and did not ever mention DBar.

¶ 21　　　　Plaintiff called Brett MacDonald,[1] the president and owner of defendant, as a witness. MacDonald testified that defendant obtained customers by hiring independent marketing companies to solicit business after a storm. MacDonald testified that invoices that had been admitted into evidence reflected payments and credits submitted to defendant.

---

[1] MacDonald's name is spelled "McDonald" in a number of places throughout the record on appeal. We use the spelling MacDonald provided when asked to spell his name on the witness stand.

¶ 22    MacDonald testified that defendant had an office in Schaumburg, that the Weatherguard name appeared outside the office building, that Weatherguard employees worked in that office, and that Farbaky had worked in that office. MacDonald testified that Weatherguard had written checks to Farbaky and issued a 1099 to Farbaky. MacDonald testified that Farbaky was never an employee of defendant and that he would "absolutely" tell Farbaky to indicate that DBar was an independent marketing company.

¶ 23    MacDonald testified that he "knew that there were people going out and representing themselves as claims specialists on behalf of Weatherguard" and admitted that there was nothing in writing requiring the claims specialists to indicate that they were independent contractors, not employees of defendant. However, he testified that "Dave, specifically, knew not to tell people he's an employee, absolutely."

¶ 24    On July 13, 2011, defendant filed a motion for a directed finding, arguing that plaintiff had failed to prove the allegations in his amended complaint. On July 22, 2011, the trial court denied Weatherguard's motion, finding that plaintiff had established a *prima facie* case supporting the allegations of his amended complaint.

¶ 25    The bench trial resumed on November 9 and 10, 2011, with defendant's case-in-chief. Defendant's only witness was MacDonald, who testified that defendant worked with independent marketing companies to solicit business. MacDonald explained that "[i]f a storm hits, what we need is a marketing force or people to go out and sell or market our services. So what we do is we engage in a relationship with an independent company, whether it's they act as an individual or they hire on a group [of] people. That's up to them. They designate their own territory, and they implement their own marketing plan, and Weatherguard will build out those contracts as they are turned in." MacDonald testified that

8

defendant and the marketing company would typically split the net commission: "[t]heir responsibilities for that split are they handle everything with the homeowner, the insurance company, the invoice, and the collections of payment, meeting the inspector, specking [*sic*] it out. Weatherguard's obligation is to provide the service of building the roof or the siding and follow up on warranty work if there is a warranty issued." MacDonald testified that at any given time, defendant had no fewer than three to five marketing companies soliciting business in the marketplace. Defendant did not have written agreements with the marketing companies.

¶ 26    MacDonald testified that he was familiar with DBar Enterprises, Inc., which was "Dave Farbaky's company that we have done a lot of work with." MacDonald testified that Farbaky was never an employee of defendant and that DBar was an independent marketing company with which defendant had a contract. Defendant placed no restrictions on the way in which its independent marketing companies solicited business for defendant and did not advise them as to how to conduct business or how to perform their hiring practices.

¶ 27    MacDonald testified that the first time he heard plaintiff's name was when plaintiff's attorney contacted defendant. At the time that plaintiff was soliciting business for defendant, MacDonald was the only person who could enter into an employment agreement with anyone working on the sales side of defendant. MacDonald testified that he never entered into any sort of contract with plaintiff, that nobody else had the authority to do so, and that Farbaky did not have the authority to bind defendant to any agreements.

¶ 28    MacDonald testified that for an independent marketing company to earn a commission, it was not enough simply to obtain a contract with a customer. MacDonald explained that "[f]or the marketing company to earn a commission, they have to market for the business, so they

9

have to find a territory that has damage. They have to get assigned. They have to meet with the adjuster. They have to go over scope with the adjuster, measure the project, inspect the project for the production, get the project turned into production. If there [are] any shortages on the job, it's something they have to manage. They have to handle customers' particular bills. They have to handle invoicing, and all checks, first payment and final payment." MacDonald testified that in situations where a marketing company left the job before it was completed and another marketing company took over, the two marketing companies would "come up with some sort of an arrangement" to split the commission.

¶ 29        MacDonald testified that when defendant and a marketing company decided to work together, the marketing company was "granted access to use any marketing or promotional [materials] we have." MacDonald testified that "[a]ny job they turn into Weatherguard, *** ten percent of that price goes into overhead. So it's up to them. They can use as much of it or as little as they want. They usually find it's to their benefit that the more materials we have out there they can use." The overhead that the marketing companies paid also granted them access to the use of defendant's office space.

¶ 30        MacDonald testified that the agreement between defendant and DBar provided for a 40% commission, so DBar would receive 40% of the net profit or loss once a job was paid in full.

¶ 31        MacDonald testified that he searched defendant's records for all of the jobs that plaintiff alleged he was owed commission on, and compiled an exhibit containing copies of defendant's payments for each of those jobs. Defendant's exhibit no. 8, which was admitted into evidence, was a summary chart, with the columns representing (1) the job number defendant used to track the job, (2) the homeowner's name, (3) whether commission was paid on the job, (4) the total profit on the job, (5) DBar's 40% commission, (6) the 20%

commission plaintiff alleged he was owed, and (7) the check number used to pay the job. As to the 20% commission, MacDonald testified:

"Q. So if the Court gets to damages, these are the damages that are appropriate.

That would be owed by DBAR to Mr. Thomas, just so we are clear on this, and so the net if you deduct those out, the net commissions that Mr. Thomas should have received from DBAR would have been what in addition?

A. I wouldn't say should have. I would say what he potentially could have been owed by DBAR would be 12,126.

Q. Why do you say potentially?

A. Because if he were to receive a full commission of 20 percent, that would be what he would be owed. I know through the course of testimony that Thomas did not stay around to complete the projects, so I don't understand if I'm in Dave's position why Dave would be paying him a full commission for only doing a quarter of the work that needed to be completed on the file."

MacDonald further testified that defendant had paid DBar in full all commissions owed on the jobs identified by plaintiff as jobs he had procured.

¶ 32     On January 25, 2013, the trial court issued a written order and opinion on the case. The court found that defendant held Farbaky out as its agent and as a result an apparent agency relationship occurred, finding:

"It allowed him to respond to job applications put into the market by Weatherguard. It allowed its name to be the sole business entity on Farbaky's and Thomas' business cards. It allowed use of its offices, address, hats, jackets, car boards, marketing materials, web-site advertising, use of its name exclusively in training scripts, use of

its secretarial staff and more. Weatherguard had some control over the day to day practices of the claims specialists. It provided the contracts bearing its name. It communicated with homeowners' insurance adjusters and to arrange days when the adjuster would view the house. It contacted the claims specialists to know the days when the adjuster would be at the house so that the claim specialist could make a point of being present. Further, Weatherguard's production manager has final say on whether the contract will be completed by Weatherguard."

¶ 33    The court found plaintiff's testimony credible and found that "[h]e offered sufficient indicia to establish apparent agency, so the Court finds that Farbaky was at all relevant times an agent of Weatherguard." Consequently, the court found that defendant was bound by the oral agreement between Farbaky and plaintiff for plaintiff to work as a claims specialist for defendant. The court further explained:

"This is all to say that Weatherguard failed to sufficiently distance itself from the claims specialists and independent contractors in its advertising and job applications. That it allowed the use of its name and logo without explaining the company's internal structure, and that Weatherguard possessed full knowledge that claims specialists represented themselves as Weatherguard people supports the notion that the company did very little to distance itself from the benefits associated with having customers assume the claims specialists were in fact Weatherguard agents and employees.

Thomas gave clear and uncontradicted testimony that Farbaky wore a Weatherguard uniform at the Weatherguard offices[;] that Farbaky responded to Weatherguard job applicants at the Weatherguard office and explained the business;

12

that Farbaky provided Weatherguard marketing material to Thomas including hat, jacket, car logos, business cards, and customer introduction scripts; that Thomas procured a solicitor permit d/b/a Weatherguard; that Farbaky trained Thomas to represent that he was from Weatherguard[;] that customer contracts included Weatherguard logos on them; and that the contracts were turned in to the Weatherguard office. Mr. McDonald [*sic*] testified that he paid Dave Farbaky 40% commission on the contracts and paid Farbaky by personal checks. He also testified that Farbaky could call himself anything he wanted to and had knowledge that Farbaky represented himself as a field manager and a claims specialist for Weatherguard."

¶ 34    The court found that "there seems to be some lack of clarity as to whether the 20% commission was to be paid per contract secured minus any materials and build out costs" but nevertheless found that "Thomas and Weatherguard had an oral contract whereby Thomas was to receive commissions of 20% of the completed contract, the net, that he secured."[2] The court noted that plaintiff kept records of the contracts he secured, basing his commissions on numbers supplied to him by the insurance adjuster on each contract or on "an educated estimate based upon his walking the roof and reviewing the damage and what he had learned on the job dealing with the insurance adjusters." The court found that plaintiff was entitled to a 20% commission on the net value of each of the 31 completed contracts plaintiff secured and ordered that "[i]n determining the 20% net of each of the 31 contracts, the Court directs the Parties to figure out the amount due on commissions according to the finding above. In

_____

[2] Since the trial court found that there was a contract, it declined to rule on plaintiff's alternative unjust enrichment claim.

13

other words, use 20% of the net profits from each contract secured by Mr. Thomas that was accepted and built out by Weatherguard."

¶ 35      The court also found that defendant violated the Wage Payment Act. The court found that defendant was plaintiff's employer for purposes of the Wage Payment Act because "Mr. McDonald's [*sic*] conduct indicated a manifestation of mutual assent to enter into an agreement with Mr. Thomas." The court further found that defendant "assume[d] the duty to pay Thomas according to a compensation formula." The court found that "Weatherguard, per contract with Farbaky, paid Farbaky approximately 40% commission on contracts he secured. Farbaky told Thomas that Weatherguard would pay him 20% on contracts Thomas secured. Weatherguard not only indirectly paid Thomas but by virtue of the Court's finding that Farbaky was Weatherguard's agent, Weatherguard directly paid Thomas and assumed the duty to pay per a compensation formula. Further, Thomas acted directly in the interest of Weatherguard and the contracts he secured directly benefitted Weatherguard." Due to defendant's violation of the Wage Payment Act, the court doubled the amount of the commission award.

¶ 36      On April 4, 2013, defendant filed "Objections to the Court's Procedure for Establishing Damages and to Plaintiff's Proposed Judgment Order," in which it objected to the trial court's procedure for establishing damages. On April 5, 2013, the trial court entered an order sustaining defendant's objections and stating that the court would determine the amount of damages to be awarded.

¶ 37      On April 17, 2014, the trial court entered a written order awarding plaintiff damages. The court found that plaintiff was promised a commission of 20% per contract he secured for Weatherguard but that "[a]t trial, Mr. Thomas failed to prove up his damages in terms of the

net percentage of each contract he secured." The court found that "[h]e gave credible testimony that he secured thirty-one contracts which benefitted Weatherguard and that the gross total on these contracts amounted to approximately two hundred twenty-three thousand, nine hundred thirty-two dollars and sixty cents ($223,932.60)." However, although plaintiff sought 20% of the gross amount of the contracts, the court had previously determined that he was entitled to 20% of the net amount.

¶ 38    The court noted that "[n]o documents admitted into evidence at trial produced the amount netted on the contracts," but further noted that MacDonald's testimony on behalf of Weatherguard indicated that "materials costs and build out costs, among other costs, reduced the gross amounts." The court recounted MacDonald's testimony that "in reviewing Defendant's exhibit #8, he reviewed all the jobs where Mr. Thomas alleged he should have earned a commission and correlated these jobs to checks paid out by Weatherguard to D'Bar [*sic*] and that amount is approximately twelve thousand, one hundred twenty-six dollars and fifty-two cents ($12,126.52)." The court found:

"Because the court cannot rely upon the speculative amounts sought by the Plaintiff, the court will rely upon the testimony of Mr. Brett MacDonald and award Mr. Raymond Thomas a total amount of Eighteen thousand, four hundred fifty-three dollars and four cents ($18,453.04). That number is calculated by the $12,126.52 amount less the draw amount already paid, which is two thousand, nine hundred dollars ($2,900.00), or Nine thousand two hundred twenty-six dollars and fifty two cents ($9,226.52[)], doubled, plus court costs."

¶ 39    Defendant filed a motion to reconsider on May 16, 2014. In one of its arguments, defendant claimed that the trial court's doubling of the commission amount pursuant to the

Wage Payment Act was an incorrect application of the law. In his response to defendant's motion to reconsider, plaintiff argued that the trial court should have applied the 2011 amendment to the Wage Payment Act, which added a provision providing for attorney fees and increased the penalty for nonpayment of wages.

¶ 40    On August 14, 2014, the trial court entered an order granting defendant's motion to reconsider in part and denying it in part. The court vacated the April 17, 2014, judgment in part and awarded plaintiff $9,226.52 plus costs, striking the doubling of the damages award.

¶ 41    On September 11, 2014, plaintiff filed a notice of appeal in appeal No. 1-14-2785, appealing the modification of the damages award. On September 12, 2014, defendant filed a notice of appeal in appeal No. 1-14-2807. The two appeals were consolidated on November 4, 2014.

¶ 42                                    ANALYSIS

¶ 43    On appeal, defendant argues that the trial court's finding that Farbaky was defendant's agent, its finding that plaintiff was entitled to a 20% commission, and its award of damages to plaintiff were against the manifest weight of the evidence. We note that defendant does not argue on appeal that it was not an employer under the Wage Payment Act or that plaintiff was not an employee under the Wage Payment Act; the only issue on appeal is whether the trial court erred in finding that plaintiff was *defendant's* employee and not DBar's. Thus, we have no need to consider the propriety of the trial court's rulings on the applicability of the Wage Payment Act, other than its underlying findings that Farbaky had the apparent authority to hire plaintiff on defendant's behalf and to enter into a binding contract with him.

¶ 44    Plaintiff, by contrast, argues that the trial court should have applied the amended Wage Payment Act to its damages award. We consider each argument in turn.

16

¶ 45                                    I. Trial Court's Findings

¶ 46        All three of defendant's arguments are focused on the trial court's findings. "The trial judge, as the trier of fact, is in a position superior to a reviewing court to observe witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive." *Bazydlo v. Volant*, 164 Ill. 2d 207, 214-15 (1995). "A reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the fact finder." *Bazydlo*, 164 Ill. 2d at 214. Consequently, we will not reverse the trial court's judgment unless it is against the manifest weight of the evidence. *Farmers Automobile Insurance Ass'n v. Gitelson*, 344 Ill. App. 3d 888, 891-92 (2003). "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Bazydlo*, 164 Ill. 2d at 215.

¶ 47                                           A. Agency

¶ 48        Defendant first argues that the trial court erred in finding that defendant had created the appearance that Farbaky had the authority to hire plaintiff on defendant's behalf. "Generally, the question of whether an agency relationship exists and the scope of the purported agent's authority are questions of fact." *Kaporovskiy v. Grecian Delight Foods, Inc.*, 338 Ill. App. 3d 206, 210 (2003). In the case at bar, we cannot find that it was against the manifest weight of the evidence for the trial court to find that Farbaky was defendant's apparent agent for the purpose of hiring plaintiff.

¶ 49        Apparent authority is that authority which a reasonably prudent person would naturally suppose the agent to possess, given the words or conduct of the principal. *State Security Insurance Co. v. Burgos*, 145 Ill. 2d 423, 431-32 (1991). "It is a well-established precept of

17

agency law that a principal will be bound by the authority he *appears* to give to another, as well as that authority which he actually gives." (Emphasis in original.) *Burgos*, 145 Ill. 2d at 431 (citing *Lynch v. Board of Education of Collinsville Community Unit District No. 10*, 82 Ill. 2d 415, 426 (1980)). Once the principal has created the appearance of authority, he is estopped from denying it to the detriment of a third party. *Burgos*, 145 Ill. 2d at 432. To establish apparent agency, the party alleging the existence of the agency must prove that (1) the principal or its agent acted in a manner that would lead a reasonable person to believe that the individual allegedly at fault was an employee or agent of the principal; (2) the principal had knowledge of and acquiesced in the acts of the agent; and (3) the injured party acted in reliance upon the conduct of the principal or its agent, consistent with ordinary care and prudence. *Wilson v. Edward Hospital*, 2012 IL 112898, ¶ 18.

¶ 50     In the case at bar, as the trial court noted:

> "Defendant allowed [Farbaky] to respond to job applications put into the market by Weatherguard. It allowed its name to be the sole business entity on Farbaky's and Thomas' business cards. It allowed use of its offices, address, hats, jackets, car boards, marketing materials, web-site advertising, use of its name exclusively in training scripts, use of its secretarial staff and more. Weatherguard had some control over the day to day practices of the claims specialists. It provided the contracts bearing its name. It communicated with homeowners' insurance adjusters and to arrange days when the adjuster would view the house. It contacted the claims specialists to know the days when the adjuster would be at the house so that the claim specialist could make a point of being present. Further, Weatherguard's production manager has final say on whether the contract will be completed by Weatherguard."

We agree with the trial court that such conduct would reasonably lead a person to believe that he was employed by defendant or an agent of defendant, not an employee or agent of an independent marketing company.

¶ 51    Defendant argues that this conduct demonstrated only that Farbaky was authorized to use defendant's name in selling its services, not that Farbaky had the authority to hire plaintiff. In support, defendant cites *Wing v. Lederer*, 77 Ill. App. 2d 413 (1966). We do not find this argument persuasive. In *Wing*, the court rejected the plaintiff's apparent authority claim because "[t]he plaintiff had no contact with [the defendant] either before or during the time in which the work was done, and [the defendant] neither did nor failed to do anything which would justify the plaintiff in assuming that [the purported agent] had authority to hire him." *Wing*, 77 Ill. App. 2d at 417. In the case at bar, by contrast, plaintiff testified that he responded to an advertisement of defendant, arrived at defendant's building, observed people with Weatherguard uniforms, and was given a Weatherguard business card, all of which MacDonald corroborated was permitted by defendant. Plaintiff further testified that Farbaky exclusively used defendant's name and never mentioned DBar to plaintiff, even when plaintiff was interviewing for employment. We cannot find that it was against the manifest weight of the evidence for the trial court to conclude that a reasonable person would have believed that he was being hired to work for defendant.

¶ 52    Defendant further argues that plaintiff failed to exercise any diligence in determining whether Farbaky had the authority to hire him to work for defendant. Defendant is correct that one dealing with an agent has to act with reasonable diligence and prudence in determining the scope of the agent's authority. *Cove Management v. AFLAC, Inc.*, 2013 IL App (1st) 120884, ¶ 27. However, plaintiff testified that when he received a personal check

from Farabaky, he questioned Farbaky about it and was assured that it was merely an advance payment until plaintiff received his entire commission. The trial court heard plaintiff's testimony and we will not second-guess the weight to be given his testimony. See *Bazydlo*, 164 Ill. 2d at 214-15 ("The trial judge, as the trier of fact, is in a position superior to a reviewing court to observe witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive."). Accordingly, we cannot find that the trial court's finding that Farbaky was defendant's apparent agent was against the manifest weight of the evidence.

¶ 53                                B. Oral Contract

¶ 54        Defendant next argues that the trial court erred in finding that Fabarky and plaintiff had agreed that plaintiff was entitled to 20% of the net profits on the contracts plaintiff secured. Plaintiff testified that Farbaky promised him that plaintiff would "be paid 20 percent of the total job." In ruling, the trial court noted that "there seems to be some lack of clarity as to whether the 20% commission was to be paid per contract secured minus any materials and build out costs" but nevertheless found that "Thomas and Weatherguard had an oral contract whereby Thomas was to receive commissions of 20% of the completed contract, the net, that he secured." We cannot find this finding to be against the manifest weight of the evidence.

¶ 55        "The existence of an oral contract, its terms, and the intent of the parties are questions of fact, and the trial court's determinations on those questions will be disturbed only if they are against the manifest weight of the evidence." *Anderson v. Kohler*, 397 Ill. App. 3d 773, 785 (2009). In the case at bar, the trial court heard plaintiff's testimony and determined that there was an oral contract in which plaintiff was entitled to a 20% commission on the net amount of the contracts he secured. Defendant contends that the trial court "rejected" plaintiff's

testimony about the contract. However, the trial court merely noted that there was "some lack of clarity" as to whether the 20% was paid on a gross or net figure, and concluded that it should be paid on the net figure. Indeed, the trial court expressly noted that it found plaintiff's testimony to be credible. Accordingly, it was not against the manifest weight of the evidence for the trial court to find that plaintiff and Farbaky had an oral contract for plaintiff to receive a 20% commission on the net amount of each contract plaintiff secured on behalf of defendant.

¶ 56                                    C. Damages

¶ 57        Finally, defendant argues that the trial court erred in awarding damages to plaintiff because plaintiff failed to prove his damages. "Damages are an essential element of a breach of contract action and a claimant's failure to prove damages entitles the defendant to judgment as a matter of law." *In re Illinois Bell Telephone Link-Up II & Late Charge Litigation*, 2013 IL App (1st) 113349, ¶ 19. In the case at bar, defendant argues that the trial court acknowledged that plaintiff's evidence as to damages was speculative and accordingly, judgment should have been entered in its favor when it made its motion for a directed finding. We do not find this argument persuasive.

¶ 58        The trial court noted that plaintiff kept records of the contracts he secured, basing his commissions on numbers supplied to him by the insurance adjuster on each contract or on "an educated estimate based upon his walking the roof and reviewing the damage and what he had learned on the job dealing with the insurance adjusters." Additionally, while testifying in plaintiff's case-in-chief, MacDonald testified that invoices that had been admitted into evidence reflected payments and credits submitted to defendant. In determining whether a directed finding is appropriate, "[a] plaintiff must present at least some evidence on every

21

essential element of the cause of action or the defendant is entitled to judgment in his or her favor as a matter of law." *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 123 (2004). Here, plaintiff did provide some evidence on damages in his case-in-chief and, accordingly, defendant was not entitled to a directed finding.

¶ 59        Furthermore, while testifying in defendant's case-in-chief, MacDonald testified to a more precise damages amount, which the trial court relied on in its calculation of damages. Defendant argues that the trial court "mischaracterized" MacDonald's testimony because he "testified that the $12,126.52 was not necessarily owed to" plaintiff. However, the trial court did not use MacDonald's testimony to determine that plaintiff was entitled to 20% of the net proceeds. Instead, the trial court *first* determined that plaintiff was entitled to 20% of the net proceeds. Then, *after* making that determination, the trial court relied on MacDonald's testimony, in which MacDonald had supplied the dollar amounts representing 20% of the net proceeds for each contract that plaintiff had secured. Thus, the trial court did not "mischaracterize" MacDonald's testimony in any way. Accordingly, we cannot find that the trial court erred in awarding plaintiff damages and affirm the trial court's judgment in plaintiff's favor.

¶ 60                                    II. Wage Payment Act

¶ 61        In his appeal, plaintiff argues that the trial court erred by refusing to apply the 2011 amendment to section 14 of the Wage Payment Act retroactively. The 2011 amendment added new language to the Wage Payment Act, which now provides:

> "(a) Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, the amount

of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees." 820 ILCS 115/14(a) (West 2010).

Plaintiff argues that both the 2% monthly interest on unpaid wages and the attorney fees provisions of the amendment should be applied retroactively. We note that defendant does not make any argument concerning the applicability of the 2% monthly interest payment on unpaid wages. However, we consider both provisions in our analysis.

¶ 62    As an initial matter, defendant argues that plaintiff's request to apply the amended statute is untimely, as it was raised for the first time in plaintiff's response to defendant's motion to reconsider. However, as plaintiff points out, part of defendant's motion to reconsider was arguing that the trial court had not properly applied the Wage Payment Act in doubling plaintiff's damages award. Thus, the proper application of the Wage Payment Act was raised by defendant in its motion to reconsider. Furthermore, forfeiture is an admonition to the parties, not a limitation upon the powers of courts of review. *Flynn v. Ryan*, 199 Ill. 2d 430, 438 n.1 (2002). Accordingly, we choose to consider the merits of plaintiff's argument.

¶ 63    Whether an amendment to a statute will be applied prospectively or retroactively is a matter of statutory construction. *Deicke Center-Marklund Children's Home v. Illinois Health Facilities Planning Board*, 389 Ill. App. 3d 300, 303 (2009). Therefore, we review this issue *de novo*. *Chicago Title Land Trust Co. v. Board of Trustees of the Village of Barrington*, 376 Ill. App. 3d 494, 498 (2007). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 64      When called upon to determine whether an amended statute may be applied retroactively, Illinois courts follow the approach set forth by the United States Supreme Court in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). *People ex rel. Madigan v. J.T. Einoder, Inc.*, 2015 IL 117193, ¶ 29. "The *Landgraf* analysis consists of two steps. First, if the legislature has expressly prescribed the statute's temporal reach, the expression of legislative intent must be given effect absent a constitutional prohibition. Second, if the statute contains no express provision regarding its temporal reach, the court must determine whether the new statute would have retroactive effect ***." *Allegis Realty Investors v. Novak*, 223 Ill. 2d 318, 330-31 (2006). Absent a retroactive effect, or impact, the amended statute will apply retroactively. *Caveney v. Bower*, 207 Ill. 2d 82, 91 (2003); see also *Schweickert v. AG Services of America, Inc.*, 355 Ill. App. 3d 439, 442 (2005).

¶ 65      In *Caveney v. Bower*, 207 Ill. 2d 82, 94 (2003), the supreme court noted that Illinois courts will rarely need to go beyond step one of the *Landgraf* analysis. This is because an amendatory act which does not, itself, contain a clear indication of legislative intent regarding its temporal reach, will nevertheless be presumed to have been framed in view of the provisions of section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2000)). *Caveney*, 207 Ill. 2d at 92. Construing this statutory language, the supreme court held that section 4 "represents a clear legislative directive as to the temporal reach of statutory amendments and repeals: those that are procedural in nature may be applied retroactively, while those that are substantive may not." *Caveney*, 207 Ill. 2d at 92.

¶ 66      " 'Procedure is the machinery for carrying on the suit, including pleading, process, evidence and practice, whether in the trial court, or in the processes by which causes are carried to the appellate courts for review, or laying the foundation for such review.' " *Deicke,*

389 Ill. App. 3d at 303 (quoting *Ogdon v. Gianakos*, 415 Ill. 591, 596 (1953)). On the other hand, a substantive change in the law establishes, creates or defines rights. *Schweickert*, 355 Ill. App. 3d at 443. Only those amendments that are procedural in nature may be applied retroactively. *Schweickert*, 355 Ill. App. 3d at 442.

¶ 67    However, even if a statutory amendment is procedural, it may not be applied retroactively if the statute would have a retroactive impact. *Commonwealth Edison Co. v. Will County Collector*, 196 Ill. 2d 27, 38 (2001). An amended statute will be deemed to have retroactive impact if application of the new statute would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. *Allegis Realty*, 223 Ill. 2d at 331.

¶ 68    In the case at bar, the parties agree that the 2011 amendment does not specifically indicate the temporal, or retroactive, reach of the amended statute. Thus, we begin by determining whether the 2011 amendment to section 14 of the Wage Payment Act is procedural or substantive. Defendant argues that the attorney fees portion of the 2011 amendment cannot be applied retroactively because it creates a new type of liability and is therefore a substantive change. We do not find this argument persuasive.

¶ 69    Defendant relies primarily on *People ex rel. Madigan v. J.T. Einoder, Inc.,* 2015 IL 117193. In *Einoder*, the State filed a complaint against operators of an unpermitted landfill, alleging that the operators were dumping solid waste without a permit, in violation of the Environmental Protection Act (415 ILCS 5/1 *et seq.* (West 2000)). *Einoder*, 2015 IL 117193, ¶ 1. During the period that the landfill was operating, the part of the Environmental Protection Act that pertained to injunctions only permitted prohibitory injunctive relief, to restrain future violations. *Einoder*, 2015 IL 117193, ¶ 27. Accordingly, the State sought a

preliminary injunction to prevent the landfill operators from future dumping of waste. *Einoder*, 2015 IL 117193, ¶ 14.

¶ 70    After the landfill had ceased operating and after the complaint was filed, the legislature passed an amendment to section 42(e) of the Environmental Protection Act, which allowed the State to seek a mandatory injunction to address past violations. *Einoder*, 2015 IL 117193, ¶ 1. Consequently, at the remedies phase of the bifurcated trial, the State additionally sought a mandatory injunction to force the landfill operators to remove the pile of solid waste. *Einoder*, 2015 IL 117193, ¶ 17. The landfill owners' witness testified that the removal could cost between $65 and $130 million. *Einoder*, 2015 IL 117193, ¶ 18. While the State disputed the actual amount of the cost, even the State's expert admitted that the mandatory injunction could cost the landfill owners $6.8 million in cleanup costs. *Einoder*, 2015 IL 117193, ¶ 18. The State argued that the amendment to section 42(e) was procedural in nature because it related to remedies, so it could apply retroactively. *Einoder*, 2015 IL 117193, ¶ 35.

¶ 71    The supreme court rejected the State's argument that the amendment was procedural. *Einoder*, 2015 IL 117193, ¶ 36. Instead, the supreme court held that even though the amendment related to remedies for the State, the amendment *also* created an entirely new type of liability for the landfill owner, one that was not available under the preamended section 42(e). *Einoder*, 2015 IL 117193, ¶ 36. Citing *Caveney*, 207 Ill. 2d at 95, the supreme court held that the amendment's creation of a new liability was a substantive change to the law that could not be applied retroactively. *Einoder*, 2015 IL 117193, ¶ 36.

¶ 72    Plaintiff argues that the amendment in this case is distinct from that at issue in *Einoder* because attorney fees were available prior to the 2011 amendment. We agree. The amendment in this case did not create the remedy of attorney fees in suits under the Wage

26

Payment Act. Prior to the 2011 amendment, attorney fees could be sought in Wage Payment Act suits, under the Attorneys Fees in Wage Actions Act (705 ILCS 225/1 (West 2010)). The Attorneys Fees in Wage Actions Act provided a process to obtain attorney fees whenever an "employee brings an action for wages earned and due and owing according to the terms of the employment." 705 ILCS 225/1 (West 2010). A suit brought under the Wage Payment Act falls within that category. See *Andrews v. Kowa Printing Corp.*, 351 Ill. App. 3d 668, 683 (2004), *aff'd*, 217 Ill. 2d 101 (2005); *Schackleton v. Federal Signal Corp.*, 196 Ill. App. 3d 437, 440 (1989). Thus, the provision of the 2011 amendment to section 14 of the Wage Payment Act that granted attorney fees merely changed the source of the statutory authority for a remedy that was already available to claimants.

¶ 73    By contrast, in *Einoder*, the amendment to the Environmental Protection Act provided a remedy to the State that was not available prior to the enactment of that amendment. At both the commencement of the lawsuit and all times when the landfill was operating, the landfill owners had no reason to suspect that they would be required to pay millions of dollars to remove the pile of solid waste. Not until the landfill ceased to operate was the mandatory injunction an option for the State. The mandatory injunction was an entirely new remedy and an entirely new liability. Therefore, the amendment in *Einoder* did more than alter procedure for remedies available to the State; it created a brand new one. See *Einoder*, 2015 IL 117193, ¶ 36. Because the attorney fees provision of the 2011 amendment does not create a new liability, but merely alters the statutory authority for that liability, that provision of the amendment is procedural.

¶ 74    However, while we agree with plaintiff concerning the attorney fees provision of the amendment, we cannot agree with its argument concerning the addition of an award of 2%

27

monthly interest on the unpaid wages. To argue that the entire 2011 amendment to section 14 of the Wage Payment Act is procedural, plaintiff relies in part on the analysis of the Northern District of Illinois in *Brandl v. Superior Air-Ground Ambulance Service, Inc.*, No. 09 C 06019, 2012 WL 7763427 (N.D. Ill. Dec. 7, 2012). The Northern District addressed the portion of the 2011 amendment to the Wage Payment Act that pertained to the 2% monthly interest on the unpaid wages. *Brandl*, 2012 WL 7763427, at *2. The court found that the amendment was procedural because it only related to remedies, which were traditionally given retroactive application in Illinois. *Brandl*, 2012 WL 7763427, at *2 (quoting *Shoreline Towers Condominium Ass'n v. Gassman*, 404 Ill. App. 3d 1013, 1023 (2010)). Therefore, the court applied the 2% monthly interest to the unpaid wages.

¶ 75    We decline to follow the Northern District's reasoning in *Brandl* in light of the supreme court's more recent decision in *Einoder*. The supreme court made clear in *Einoder* that when an amendment to a law creates a new liability, unavailable under the previous version of the law, that new liability is a substantive change. *Einoder*, 2015 IL 117193, ¶ 36. While the attorney fees were always a potential liability in this case, the 2% monthly interest on unpaid wages was not. Therefore, the 2% charge for each month of underpayment is a substantive change in the law and cannot be applied retroactively. Only the attorney fees provision of the amendment is procedural in nature.

¶ 76    A finding that the statutory change is procedural in nature, however, does not end our inquiry. Even if a statutory amendment is procedural, it may not be applied retroactively if the statute would have a retroactive impact or effect. An amended statute has a retroactive impact or effect if it (1) impairs rights that a party possessed when it acted, (2) increases a party's liability for past conduct, or (3) imposes new duties with respect to transactions

28

already completed. *Schweickert*, 355 Ill. App. 3d at 444. The attorney fees provision does not impair rights of the parties. The attorney fees provision also does not impose new duties on the parties, so the final step of our analysis considers the second possible retroactive impact: increased liability for past conduct.

¶ 77      We agree with plaintiff that the attorney fees do not increase liability for past conduct because the attorney fees were available before and after the 2011 amendment. Whether the amendment applied or not, defendant could be charged with reasonable attorney fees, either under the Attorneys Fees in Wage Actions Act or under the Wage Payment Act. The reasonableness of the fees would not change regardless of whether the amendment applied; so neither would the amount of the fees. Therefore, the attorney fees provision of the amendment does not have a retroactive impact and may be applied retroactively.

¶ 78      In the case at bar, the trial court denied plaintiff's request for attorney fees because plaintiff did not meet the requirements for attorney fees under the Attorneys Fees in Wage Actions Act. Because the Wage Payment Act does not contain those requirements, we remand this case to the trial court for the limited purpose of applying the attorney fees provision of the 2011 amendment retroactively and awarding plaintiff "costs and all reasonable attorney's fees." 820 ILCS 115/14(a) (West 2012).

¶ 79                                        CONCLUSION

¶ 80      We affirm the trial court's judgment in plaintiff's favor. However, we remand the case to the trial court for the limited purpose of determining reasonable attorney fees, as required by the 2011 amendment to the Wage Payment Act.

¶ 81      Affirmed; cause remanded for determination of attorney fees.