# Illinois Official Reports

## Appellate Court

---

### *Gilmore v. Carey*, 2017 IL App (1st) 153263

---

| | |
|---|---|
| Appellate Court Caption | CHRISTOPHER GILMORE, Plaintiff-Appellant, v. CHARLES CAREY, JOSEPH NICIFORO, and HENNING-CAREY PROPRIETARY TRADING, LLC, Defendants-Appellees. |
| District & No. | First District, First Division<br>Docket No. 1-15-3263 |
| Filed | February 14, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-8708; the Hon. Thomas R. Mulroy, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. Remanded with directions. |
| Counsel on Appeal | Michael A. Ficaro, Dean J. Polales, and Richard H. Tighman IV, of Nixon Peabody LLP, of Chicago, for appellant.<br><br>Chris Gair, Jeffrey S. Eberhard, and Thomas R. Heisler, of Gair Law Group, Ltd., of Chicago, for appellees. |
| Panel | JUSTICE SIMON delivered the judgment of the court, with opinion.<br>Presiding Justice Connors and Justice Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1     This appeal is before the court following a jury trial. Plaintiff Christopher Gilmore sued his former employer and its two principals. Plaintiff sought, among other claims, a return of his capital contribution and wages he claims he is owed. The jury awarded plaintiff $128,219.03, and the court entered judgment in that amount, plus interest. Plaintiff appeals arguing that he is entitled to more. We affirm in part and reverse in part.

¶ 2                                      BACKGROUND

¶ 3     Plaintiff Christopher Gilmore is a securities and commodities trader. Defendant Henning-Carey Proprietary Trading, LLC is a trading firm located in Chicago. Defendants Joseph Niciforo and Charles Carey are the two principals of the trading firm, and each holds a 50% stake in the company.

¶ 4     In 2009, the parties began negotiations for plaintiff to come to the firm and work as a trader. Through their lawyers, the parties exchanged offers and ended up with an agreement. Their relationship is actually governed by multiple agreements and understandings, including a "Services Agreement for Business Development and Proprietary Trading" and the company's "Operating Agreement." Upon reaching an agreement, plaintiff agreed to make a $250,000 capital contribution to become a Class B member of the firm.

¶ 5     Henning-Carey has two types of proprietary traders. The firm has general proprietary trading employees, who trade on capital provided by the firm and whose losses are covered only partially by the firm. And the firm has Class B members whose trading is supported by the capital they contribute to the firm and the firm covers only a portion of the losses. Class B members receive a more favorable tax status and receive a greater share of profits than general proprietary trading employees.

¶ 6     The Services Agreement covers plaintiff's initial terms of employment. It provides that plaintiff will work for a one year term as a salaried employee. The agreement provides that plaintiff will be paid $15,000 per month, not based on performance, to manage the firm's trading operations on GOVX. The agreement further provides that plaintiff, as an independent contractor, will receive 80% of net profits generated on liquidity provided by Henning-Carey in its "Prop Trading Business" and that Henning-Carey bears the risk of, and will absorb, the losses of that business.

¶ 7     Plaintiff then made the $250,000 capital contribution to become a Class B member of the firm. As a condition of his new role as a member, plaintiff executed the Henning-Carey operating agreement that covers members of the LLC. Plaintiff admits that he became bound by this agreement when he made his capital contribution and became a Class B member of the firm. The operating agreement provides that Class B members are responsible for their own losses. Class B members at Henning-Carey work on 80/20 splits. That means that when a trader is trading under his Class B status, he receives 80% of the trading profits and assumes 80% of the trading losses, while Henning-Carey receives 20% of trading profits and assumes 20% of the trading losses.

¶ 8     Plaintiff began trading in October 2009, using what was supposed to be sophisticated trading software called Orc. However, from the beginning, plaintiff began to suffer heavy losses. Plaintiff blamed the losses on the software, claiming that it was freezing and

malfunctioning at key points. Defendants Carey and Niciforo became concerned with the large losses plaintiff was sustaining so they began to discuss amongst each other whether plaintiff's losses were attributable to the firm or if they would be mainly covered by plaintiff. Henning-Carey's risk manager testified that he met with plaintiff about the large losses and that plaintiff stated that he had "been successful before, that it was his money, and he knew what was going on with it." In the month of November 2009, plaintiff had trading losses of more than $60,000, culminating with a loss of $28,000 on November 30th. Plaintiff lost $21,000 more on December 1st.

¶ 9    The next day, the parties held a risk management meeting at which defendants expressed concern about the magnitude of plaintiff's losses. Joseph Niciforo testified that plaintiff said, "don't worry, it's mostly my money" and that plaintiff stated that he was "losing a lot more money thank you, Joe." Defendants imposed a $10,000 a day stop-loss on plaintiff, meaning that if he lost $10,000 in a day, he would have to stop trading for the day. Plaintiff continued to lose money though, about $40,000 more through the rest of December.

¶ 10    When it came time for plaintiff to be paid his $15,000 monthly salary at the end of the first pay period on January 15th, his paycheck was reduced from $7500 to $6250. His subsequent two paychecks were similarly reduced.

¶ 11    Despite the $10,000 stop-loss defendants imposed, on February 12th, plaintiff lost $39,000. Defendants decided to terminate his employment. Defendants allocated losses and expenses against plaintiff's account. Henning-Carey determined that plaintiff was responsible for 80% of the losses as a Class B trader and, when plaintiff's share of other expenses was subtracted from his account, his capital was down from $250,000 to $36,757 in just those four months.

¶ 12    Plaintiff filed this case in a seven-count complaint. Prior to trial, plaintiff filed a motion in limine to preclude defendants from introducing evidence of other traders' profit-and-loss sharing arrangements with Henning-Carey or evidence that he was treated the same as other Henning-Carey traders. Plaintiff points out that, during discovery, he attempted to secure evidence of other traders' financial arrangements with the firm, but was rebuffed by defendants, and the court ruled that discovery would be limited to plaintiff's specific relationship with the company.

¶ 13    Though plaintiff's complaint was seven counts, counts I and IV were tried to the court simultaneous to the jury trial. The trial court entered judgment for plaintiff on count I for a violation of the Illinois Wage Payment and Collection Act (Wage Payment Act) (820 ILCS 115/1 *et seq.* (West 2012)) and for defendants on count IV for breach of fiduciary duty. Counts II, III, V, VI, and VII were tried to the jury. The jury awarded plaintiff $128,219.03 on count II which was for a breach of the services agreement. The jury found for defendants on the remaining counts—counts III, V, VI, and VII.

¶ 14    Count III is for a breach of the operating agreement. At trial, defendants' own position was that it was not required to return the full capital contribution. Instead, defendant maintained that, after assessing the 80% loss and the other expenses contemplated by the parties' agreements and understandings, $36,757 was the capital remaining. The operating agreement provides that when a member ceases to be actively involved in the firm, the firm is required to return the remaining capital. Despite the undisputed evidence confirming the remaining capital and defendants' own position that plaintiff had capital remaining, the jury returned a verdict in favor of defendants on count III, awarding nothing to plaintiff.

¶ 15    On appeal, plaintiff argues that the trial court erred when it allowed defendants to introduce evidence about Henning-Carey's relationship with its other traders to suggest that plaintiff was treated the same. Plaintiff maintains that he was prejudiced and that he attempted to obtain that information during discovery but was prevented from doing so. Plaintiff also contends that the trial court erred when it denied its motion for a judgment notwithstanding the verdict on counts III and V or, alternatively, for a new trial on count III. And, since the trial court entered judgment on count I for a violation of the Wage Payment Act (820 ILCS 115/1 *et seq.* (West 2012)), plaintiff argues that the trial court erred by not awarding him attorney fees pursuant to the Act.

¶ 16    ANALYSIS

¶ 17    I. Employment Relationship and Compensation

¶ 18    Plaintiff argues that the trial court erred when it did not grant his motion for a judgment notwithstanding the verdict or his motion for a new trial. We review decisions on motions for judgments notwithstanding the verdict *de novo*. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999). A motion for judgment notwithstanding the verdict should be granted only when all of the evidence, viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict based on that evidence could stand. *Addis v. Exelon Generation Co.*, 378 Ill. App. 3d 781, 787 (2007). By contrast, a new trial should only be ordered when, after weighing the evidence, the court determines that the verdict is contrary to the manifest weight of the evidence. *McClure*, 188 Ill. 2d at 132. A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence. *Id.*

¶ 19    Plaintiff maintains that the services agreement was the only agreement that governed how his losses should be allocated, and he argues that the services agreement specified that Henning-Carey would bear the risk of loss. However, plaintiff admits that he was also bound by the operating agreement.

¶ 20    The case really comes down to the capacity in which plaintiff was trading. Was he trading as a general proprietary trader in Henning-Carey's proprietary trading business as covered in the services agreement? Or was he trading as a Class B member of the LLC, the terms of which are covered by the operating agreement? The jury resolved that question in favor of defendants—that plaintiff was to bear the risk of trading losses as a Class B member—and there is abundant evidence to support that conclusion.

¶ 21    The services agreement itself evidences that it does not pertain to plaintiff's trading as a Class B member. It includes a provision that plaintiff will, at a time in the then-near future, be offered the right to become a member of the LLC. Then, plaintiff made his capital contribution and became a Class B member, and he admittedly bound himself to the terms of the firm's operating agreement.

¶ 22    The services agreement states that plaintiff would serve in two capacities. He would be a W-2 salaried employee for working with GOVX for a year at a rate of $15,000 a month. Plaintiff would also be a K-1 or 1099 independent contractor with profit sharing for proprietary trading. But plaintiff never did any proprietary trading under the services agreement as an independent contractor before becoming a member of the LLC. The services agreement governs the relationship between Henning-Carey and plaintiff the individual—a

part-employee, part-independent contractor. The operating agreement governs the relationship between Henning-Carey and plaintiff as a Class B trader and a member of the firm.

¶ 23 The evidence at trial established that there are two types of traders at Henning-Carey: regular trading employees and member-traders. The regular trading employees do not make capital contributions and trade on liquidity provided by the firm. Class B member-traders provide capital contributions that are used to support their own trades. The evidence convincingly favored a finding that plaintiff intended to and did trade on his capital contribution as a Class B member rather than on liquidity provided by Henning-Carey. He made multiple admissions of that fact.

¶ 24 After sustaining losses, plaintiff tried to assuage Henning-Carey's principals about his trades. Plaintiff repeatedly emphasized that he was personally the one sustaining most of the losses, not the firm. When the principals of the firm expressed concern about losing money, plaintiff said things like, "don't worry, its mostly my money." Those several admissions stand in absolute contrast to his position at trial and on appeal that Henning-Carey had always agreed to bear the entire risk of loss.

¶ 25 Plaintiff contends that his admissions about losing "my money" can be justified because he was losing out on his 80% share of profits from "what would have been winning trades." But that simply does not square with the facts. Plaintiff said the losses were of "his money, and he knew what he was going on with it," among several other statements evidencing that plaintiff understood he was not just missing out on profits. At one point plaintiff even offered to personally put in money to cover his trading losses. Plaintiff said to the principals that he was "losing a lot more money than [them]." His repeated assertions that he was losing money belie his current position that defendants agreed to bear all losses. Plaintiff knew and understood that he was a Class B trader and that he had the potential to lose his capital.

¶ 26 The conclusion that defendant was trading in his capacity as a Class B member of the firm is supported amply by his own admissions. The jury heard the evidence, awarded plaintiff his contractually-owed salary, and found that he was responsible for his losses as a Class B member of Henning-Carey. The remedy that the jury fashioned makes its intent clear. The jury awarded plaintiff his contractual wages under the service agreement ($15,000/month for the remainder of the one-year term of the services agreement). Then, when the jury was asked to find that plaintiff was entitled to a return of his entire capital contribution—*i.e.*, that defendants were to bear the risk of loss for all of plaintiff's trading—the jury found in favor of defendants.

¶ 27 However, we do agree with plaintiff that the undisputed evidence entitles him to a return of the $36,757 remaining from his capital contribution. The operating agreement provides that Henning-Carey is required to return the amount remaining in a member's capital account at the time the member ceases to be actively involved in the firm. The jury was correct to find that plaintiff was not entitled to a return of his full capital contribution—that there was an agreement to deduct trading losses and expenses. But even defendants admit that, after plaintiff's trading losses and other expenses were assessed against his capital account, he had capital remaining.

¶ 28 There is simply nothing in evidence that entitles defendants to retain those funds in contravention of their own proffered interpretation of the parties' agreements and the plain terms of the operating agreement that demand its return upon separation. Defendants offer no justification on which they might be entitled to retain plaintiff's capital. In a posttrial motion, plaintiff moved for a judgment notwithstanding the verdict asking the trial court to award him

the amount that was indisputably remaining in his capital account. The trial court should have granted that motion. Plaintiff was entitled to it as a matter of law. Defendants are right that the jury can reach any verdict supported by the evidence—but this verdict was not supported, and was in fact contradicted, by the evidence. No contrary verdict based on the evidence can stand. *Addis*, 378 Ill. App. 3d at 786. So, notwithstanding the jury's verdict on count III, the trial court should have entered judgment on that count in favor of plaintiff in the amount of $36,757.

¶ 29                              II. Evidentiary Rulings

¶ 30    Plaintiff contends that the trial court erred when it allowed defendants to introduce evidence of other traders' financial arrangements with the firm, while preventing him from obtaining that information during discovery. Both parties submit that a trial judge's ruling on an evidentiary matter such as this should be reviewed for an abuse of discretion. See *Jackson v. Pellerano*, 210 Ill. App. 3d 464, 471 (1991). Plaintiff's contentions fail for multiple reasons.

¶ 31    Plaintiff opened the door to testimony about other traders' financial arrangements with the firm when he adopted a litigation strategy that accused the firm of defrauding him through a scheme that included depositing his capital contribution in a general account and then later deducting his losses and expenses in furtherance of committing fraud. In response, defendants introduced evidence that losses and expenses were settled in plaintiff's account the same way as all other Class B traders, and not as part of a scheme to defraud plaintiff. It is competent evidence from which the jury might infer that plaintiff was not deceived, as he was treated the same as similarly situated employees.

¶ 32    Moreover, plaintiff has not demonstrated that the evidence admitted at trial actually prejudiced him. It was obvious that defendants' defense in the case was going to be that, as a Class B trader, plaintiff was responsible for his losses. Plaintiff had myriad records and other record evidence that Class B members of Henning-Carey traded on 80-20 splits. Plaintiff prodded the issue during depositions and at trial. Plaintiff had the opportunity to present argument and evidence to the jury to convince it that his agreement was different. It was not an abuse of discretion for the trial court to strike plaintiff's request for the broad range of discovery he sought. And plaintiff had access to and actually had all of the information he needed to attempt to overcome defendants' defense, which he knew would be interposed. Plaintiff opened the door for the admission of the evidence and he was not unfairly prejudiced.

¶ 33                              III. Attorney Fees

¶ 34    Plaintiff also sought attorney fees under count I of his complaint for a violation of the Wage Payment Act. That count was tried to the court and the court found in plaintiff's favor. Plaintiff argues that the trial court erred by not awarding him attorney fees pursuant to the Attorneys Fees in Wage Actions Act (705 ILCS 225/1 (West 2012)) or the Wage Payment Act (820 ILCS 115/1 *et seq.* (West 2012)).

¶ 35    The purpose of the Wage Payment Act is to provide employees with a cause of action for the timely and complete payment of *earned wages* or final compensation. *Majmudar v. House of Spices (India), Inc.*, 2013 IL App (1st) 130292, ¶ 11. Here, the trial court correctly found that plaintiff was entitled to $11,250 under the Wage Payment Act. That amount represents the amount he was supposed to be paid while still in Henning-Carey's employ before he was terminated. The Wage Payment Act does not apply to the remainder of the amount that the jury found plaintiff was entitled to because those amounts are not "earned wages" that plaintiff was

not paid. *Id.* ¶ 15. Instead, it was proper for plaintiff to be awarded those future, unearned wages for breach of contract.

¶ 36    Under the Attorneys Fees in Wage Actions Act (705 ILCS 225/1 (West 2012)), on which plaintiff staked his claim for an award of fees, attorney fees are to be awarded to a plaintiff in addition to the amount found due and owing for wages if a demand is made in writing at least three days before the action was brought, for a sum not exceeding the amount so found due and owing. 705 ILCS 225/1 (West 2012). Here, plaintiff served a demand for $126,562.50 and was awarded $11,250 on his wage claim. Because plaintiff made a demand far in excess of the amount of wages found to be due, he is not entitled to fees under that Act.

¶ 37    However, after this case was filed, the General Assembly added an attorney fee provision into the Wage Payment Act itself. See 820 ILCS 115/14(a) (West 2012). The amendment to the Act was signed into law on July 30, 2010 (this case was filed on July 29, 2010), but the General Assembly expressly stated that the amendment was not to take effect until January 1, 2011. So plaintiff cannot take advantage of the amendment unless it applies retroactively back to before it was signed into law. Plaintiff maintained that it applies retroactively and that he should be relieved of his obligation to make an accurate demand under the Attorneys Fees in Wage Actions Act. The trial court disagreed.

¶ 38    The day before the trial court entered its order denying plaintiff's request for attorney fees, this court had occasion to decide whether the attorney fee amendment to the Wage Payment Act should apply retroactively. The court held that the attorney fee provision should apply retroactively because it is a procedural rule. *Thomas v. Weatherguard Construction Co.*, 2015 IL App (1st) 142785, ¶ 75. We decline to follow *Thomas* (see *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 392 n.2 (2005)) because we think it is clear that the General Assembly only intended the rule to apply prospectively.

¶ 39    In *Thomas*, the court was at a disadvantage because in that case, as the court stated to begin its analysis, "the parties agree that the 2011 amendment does not specifically indicate the temporal, or retroactive, reach of the amended statute." The court then proceeded with its analysis of the Statute on Statutes (5 ILCS 70/0.01 *et seq.* (West 2012); see *Thomas*, 2015 IL App (1st) 142785, ¶ 68) and found the rule to be procedural and apply retroactively. But what the court did not account for was that the General Assembly expressly stated that, even though the bill was signed in July 2010, it was not effective until January 2011. "[A] statute that has an express delayed implementation date but is otherwise silent as to temporal reach will be applied prospectively." *People ex rel. Alvarez v. Howard*, 2016 IL 120729, ¶ 23. Here, the General Assembly did not even want the amendment to be effective from July 2010 to January 2011, so we have clear evidence that it intended that the amendment be applicable only to proceedings commenced on or after the date it became effective. *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 187 (2011). The trial court correctly found that the amendment at issue should apply prospectively only.

¶ 40    At the time plaintiff filed his wage claim, he was required to make an accurate demand. In his complaint, and throughout the case, plaintiff sought fees specifically under the Attorneys Fees in Wage Actions Act. He never amended his complaint to seek attorney fees under the Wage Payment Act in the five years that he had the opportunity to do so. Even after trial, when plaintiff knew the disposition of his wage claim, he never sought to make the pleadings conform to the proofs. It is also important to note that plaintiff predominately failed on his wage claim, since he was awarded $100,000 less than he demanded. The earned wage issue

was a very minor part of the case; it was almost totally a breach of contract case. The amount of attorney fees for resolving the wage claim was negligible. All things considered, plaintiff's injury has been adequately remedied by awarding him a year's salary and what remains of his capital contribution. We are confident that our departure from *Thomas* will cause little disruption because the amendment to the Wage Payment Act became effective six years ago. The period of transition to the attorney fee provision in the Wage Payment Act is likely to be, or soon will be, over.

¶ 41                                              CONCLUSION

¶ 42       Accordingly, we affirm in part and reverse in part. The case is remanded with a direction that the circuit court of Cook County enter judgment in favor of plaintiff Christopher Gilmore for $36,757 on count III.

¶ 43       Affirmed in part and reversed in part. Remanded with directions.