# Illinois Official Reports

## Appellate Court

---

**1550 MP Road LLC v. Teamsters Local Union No. 700**, 2017 IL App (1st) 153300

---

| | |
|---|---|
| Appellate Court Caption | 1550 MP ROAD LLC, Plaintiff-Appellee, v. TEAMSTERS LOCAL UNION NO. 700; INTERNATIONAL BROTHERHOOD OF TEAMSTERS; JOINT COUNCIL 25 OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS; RANDY CAMMACK; JOHN COLI; PATRICK W. FLYNN; FRED GEGARE; JAMES T. GLIMCO; MICHAEL HAFFNER; KEN HALL; TERRENCE J. HANCOCK; CARROLL E. HAYNES; JAMES P. HOFFA; C. THOMAS KEEGEL; BRIAN MEIDEL; FREDERICK P. POTTER, JR.; BRIAN RAINVILLE; FRED SIMPSON; THOMAS STIEDE; and GEORGE TEDESKCHI, Defendants-Appellants. |
| District & No. | First District, First Division<br>Docket No. 1-15-3300 |
| Filed | November 13, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-5979; the Hon. Raymond W. Mitchell, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. |
| Counsel on Appeal | Richard J. Prendergast, Ltd. (Richard J. Prendergast, Michael T. Layden, Dierdre A. Close, and Brian C. Prendergast, of counsel), and Jacobs, Burns, Orlove & Hernandez (Sherrie E. Voyles and Brandon Anderson, of counsel), both of Chicago, for appellants. |

Law Office of Richard K. Hellerman, P.C., of Chicago (Richard K. Hellerman, of counsel), for appellee.

Panel     PRESIDING JUSTICE PIERCE delivered the judgment of the court, with opinion.
Justices Harris and Simon concurred in the judgment and opinion.

**OPINION**

¶ 1            BACKGROUND

¶ 2   In May 2008, plaintiff 1550 MP Road LLC entered into a lease and purchase agreement (LPA) with Teamsters Local Union No. 726 (Local 726), an unincorporated association. The LPA was executed by Thomas Clair, the secretary-treasurer and principal officer of Local 726. Local 726's executive board was aware of the negotiation of the LPA, its scope, and the reasons for entering into it. After the LPA was executed, the board passed a resolution approving the LPA. Local 726, however, executed the agreement without complying with its bylaws, which called for Local 726's members to be notified and vote to authorize the agreement. Local 726 took possession of the premises in January 2009.

¶ 3   In February 2008, while the LPA was being negotiated, the International Brotherhood of Teamsters (International) initiated an investigation of its affiliate, Local 726. The International requested that John Coli, an International vice president, a member of the International's general executive board, a member of Joint Council 25 of the International Brotherhood of Teamsters (JC25), and president of Teamsters Local Union No. 727 (Local 727), investigate the financial condition of Local 726. Approximately two weeks after the LPA's execution, Coli, who had been given a copy of the LPA during his investigation, wrote to the International with assurances that cost-cutting measures were being implemented to improve Local 726's financial condition. Coli did not mention the LPA in his letter.

¶ 4   The International's independent review board was conducting its own investigation of Local 726.[1] In June 2009, it issued a report recommending that Local 726 be placed into trusteeship. James P. Hoffa, the International's president, imposed an emergency trusteeship over Local 726 and appointed Becky Strzechowski as trustee with full control over the business activities of the local. Strzechowski viewed the LPA as a financial drain on Local 726. Strzechowski met with plaintiff to discuss modification of the LPA, but the parties failed to reach an agreement. In September 2009, the International voted to continue Local 726's trusteeship.

¶ 5   The International's general executive board met in December 2009. Coli proposed dissolving Local 726 and Teamsters Local Union No. 714 (Local 714) (which was also under

---

[1]The independent review board was established by consent decree in *United States v. International Brotherhood of Teamsters*, 22 F. Supp. 2d 131 (S.D.N.Y. 1998). The board has the authority to, among other things, recommend that local unions be placed into trusteeship.

trusteeship) and transferring the membership, assets, and liabilities of the two locals to a newly-chartered local, Teamsters Local Union No. 700 (Local 700). After dissolution of the two locals, new Local 700 would consist of essentially all of Local 726's members and the public sector members of Local 714. Shortly thereafter, the International's general executive board, including Coli, voted to revoke the charters of Local 726 and Local 714 and charter a new public employee union, Local 700, to establish a single local that would better represent their interests. Coli was appointed Local 700's trustee. The International advised Coli that "initially, [Local 700] will be structured as a consolidation of former [Local 714] and [Local 726]." The International transferred all of Local 726's membership, books, documents, property, and funds to Local 700. According to a 2009 audit, total assets of $47,883 and total liabilities of $123,299 were transferred to Local 700.

¶ 6        Local 726 was dissolved on December 31, 2009. On January 1, 2010, Local 700 occupied the space formerly occupied by Local 726 in the subject premises. Although the plaintiff and Strzechowski had engaged in negotiations to modify the LPA prior to Local 726's dissolution, Coli, Local 700's trustee, rejected any liability under the agreement signed by Local 726. Coli was adamant that "he would do nothing for [plaintiff]" that would result in Local 700 remaining in the premises or performing under the LPA. Local 700 advised plaintiff that it had taken possession of the premises and offered to create a month-to-month tenancy. Local 700 tendered a rent check, but plaintiff did not cash or deposit the check. Plaintiff and Local 700 continued to negotiate through April 2010 but failed to reach any agreement. At the end of April 2010, Coli moved Local 700's business operations to another building owned by Local 727's pension fund.

¶ 7        Plaintiff sued for breach of contract and sought damages specified in the LPA. In count I, plaintiff claimed that Local 700 was liable for the breach of the LPA under a theory of corporate successor liability because Local 726 merged into Local 700 and that Local 700 was a mere continuation of Local 726. In the alternative, plaintiff claimed in counts II and III that Local 700 was liable to plaintiff because Local 726's transfer of its assets, including its collective bargaining agreements (CBAs), to Local 700 was a fraudulent transfer under sections 5(a) and 6(a) of the Uniform Fraudulent Transfer Act (Fraudulent Transfer Act) (740 ILCS 160/5(a), 6(a) (West 2014)). In the remaining counts, plaintiff claimed that Coli, the International, JC25, and certain individual Teamster officials were liable for tortious interference with the LPA, with count VIII directed at Coli.

¶ 8        Following a bench trial, the circuit court found that (1) the LPA was valid and enforceable; (2) Local 700 was liable for Local 726's breach of the LPA under the merger, mere continuation, and fraud exceptions to the theory of successor corporate nonliability; (3) Local 700 was liable for Local 726's breach of the LPA because Local 726's transfer of its assets, including its CBAs, was a fraudulent transfer under the Fraudulent Transfer Act; and (4) Coli was personally liable for tortious interference with the LPA. Judgment was entered in favor of the International, JC25, and the remaining Teamsters officials. The circuit court granted plaintiff nearly $2 million in damages and over $320,000 in attorney fees and costs.

¶ 9        On appeal, defendants[2] argue that (1) the LPA is void *ab initio* and cannot be enforced because it was not executed in conformity with either Local 726's bylaws or the Property of

---

[2]Although this appeal was nominally filed on behalf of all of the defendants listed in the caption, the only defendants that advance any argument are Local 700 and John Coli.

Unincorporated Associations Act (Act) (765 ILCS 115/0.01 *et seq.* (West 2010)), (2) if the LPA is not void *ab initio*, then it is invalid and unenforceable because Clair lacked apparent authority to enter into the agreement, (3) the circuit court erroneously imposed corporate successor liability against Local 700, (4) a CBA is not a transferable asset for the purposes of the Fraudulent Transfer Act, (5) Coli is not liable for tortious interference with the LPA, and (6) the LPA contains an unenforceable liquidated damages provision.

¶ 10    We find that the LPA was an enforceable contract. Local 726's failure to comply with its bylaws or with the Act did not render the LPA void *ab initio*. Furthermore, Clair acted with apparent authority when executing the LPA, and Local 726's executive board ratified the LPA. We further find that Local 700 was liable for breach of the LPA based on corporate successor liability principles. We therefore affirm the circuit court's judgment finding that Local 700 was liable to plaintiff for Local 726's breach of the LPA. We reverse the circuit court's Fraudulent Transfer Act judgments in favor of plaintiff because there was no transfer of an asset by a debtor within the meaning of the Fraudulent Transfer Act, and even if there was, plaintiff failed to prove the actual value of the CBAs at issue here. We reverse the circuit court's judgment against Coli for tortious interference with a contract because, as a member of the International's general executive board and as Local 700's trustee, Coli's conduct was privileged. Finally, we affirm the circuit court's damages award in favor of plaintiff because the LPA contained an enforceable liquidated damages provision.

¶ 11                                ANALYSIS
¶ 12                        A. Enforceability of the LPA
¶ 13            1. Property of Unincorporated Associations Act and Local 726's Bylaws
¶ 14    First, we address defendants' argument that the LPA is void *ab initio* and cannot be enforced because it was not executed in conformity with the Act or with Local 726's bylaws. Defendants contend that because the union's members never voted to authorize the LPA, and because the LPA was not signed by the requisite number of union officers, Local 726 could not enter into the LPA. Defendants rely primarily on *Alliance Property Management, Ltd. v. Forest Villa of Countryside Condominium Ass'n*, 2015 IL App (1st) 150169, to argue that "a contract is void *ab initio* where one of the parties exceeded its authority to enter into the subject agreement." In the circuit court, defendants raised an affirmative defense challenging the enforceability of the LPA by asserting that it was entered into without the membership's approval but did not specifically plead a violation of the Act as an affirmative defense. Defendants raised an argument that the LPA did not comply with the Act for the first time in their posttrial motion.

¶ 15    On appeal, plaintiff contends that defendants have forfeited any argument under the Act by failing to raise it prior to trial. In response, defendants argue that the enforceability of the LPA was before the circuit court by virtue of defendants' arguments that Local 726's members were neither given notice of the LPA nor voted to approve it, and defendants therefore pleaded facts that would form a defense under the Act. See *Huszagh v. City of Oakbrook Terrace*, 41 Ill. 2d 387, 389 (1968) (finding that it is the facts of defense that must be alleged, not matters of law, and that "the question of whether a contract is void as contrary to statute or public policy is one of law"). Furthermore, defendants argue that when a party challenges the validity of a contract as being against public policy, a challenge to the validity of the agreement is not waived by failing to plead it. See *Berge v. Berge*, 366 Ill. 228, 230-31 (1937). We agree with defendants

- 4 -

that there has been no forfeiture of an argument on appeal that the LPA is void due to Local 726's failure to comply with the Act. Furthermore, even if defendants had forfeited an argument under the Act on appeal, forfeiture is a limitation on the parties, not on the courts. *Geise v. Phoenix Co. of Chicago, Inc.*, 159 Ill. 2d 507, 514 (1994).

¶ 16    Turning to the merits of defendants' argument, we find that Local 726's failure to satisfy the requirements of the Act or its bylaws prior to entering into the LPA does not render the LPA void *ab initio*. First, the Act provides that "[a]ny unincorporated lodge or subordinate body of any society or order which is duly chartered by its grand lodge or body may take, hold, or convey real estate for its own use and benefit, by lease, purchase, grant, legacy, gift or otherwise, \*\*\* according to the register of the respective grand lodge or body." 765 ILCS 115/1 (West 2010). The Act further provides:

> "The presiding officer of such lodge or subordinate body, together with the secretary or officer keeping the records thereof, may execute mortgages and execute or receive conveyances or leases of any real estate by or to such lodge or subordinate body when authorized by a vote of the members present at a regular meeting held by said lodge or subordinate body, after at least ten days' notice has been given to all members of said lodge or subordinate body by mailing a written notice of said proposed action to the last known address of all such members.
>
> All conveyances, leases or mortgages executed hereunder shall be in the name of the lodge, attested by the presiding officer and secretary or other officer in charge of the records, and shall have affixed the seal, if any, of such lodge or subordinate body." 765 ILCS 115/2 (West 2010).

Local 726's bylaws contained similar requirements: the signatures of both the secretary-treasurer and the president were required on all contracts, and notice and membership authorization was necessary in connection with the lease or purchase of real estate.

¶ 17    Here, it is undisputed that Local 726 is an unincorporated association and it did not comply with section 2 of the Act or its bylaws in connection with the LPA; it did not provide written notice to its members of the LPA, and it did not hold a vote of its members to authorize the LPA. Furthermore, the statutory language requires the signature of two officers, and Clair was the only Local 726 officer who signed the LPA. But the failure to comply with the requirements of a statute does not automatically render a contract unenforceable or void *ab initio*. See *K. Miller Construction Co. v. McGinnis*, 238 Ill. 2d 284, 296 (2010). If the statute provides that a contract that violates the statute is unenforceable, then the contract is unenforceable. *Id.* at 293. Where, however, a statute is silent as to the consequences of a violation of the statute, we must balance the public policy expressed in the statute against the countervailing policy in enforcing contractual agreements. *Id.* at 294. Furthermore, where the statute does not prescribe a particular consequence for noncompliance and noncompliance does not implicate a constitutional right, we are guided by our supreme court's observation that it may be appropriate to "determin[e] whether a particular set of circumstances justifies a court's exercise of its equitable powers to ameliorate the [void *ab initio*] doctrine's sometimes harsh results." *Perlstein v. Wolk*, 218 Ill. 2d 448, 467 (2006). We find this guidance particularly compelling here, where the subject matter of the contract (a commercial lease purchase agreement) is otherwise legitimate and contractually binding.

¶ 18 The Act is silent as to the consequences for noncompliance. Defendants argue that "[the Act] is *not* silent, but rather explicitly provides the *only* means by which an unincorporated association may enter into an enforceable contract." But defendants' argument reads into the statute the term "enforceable," a term the legislature did not use. The statutory language, as written, *is* silent as to the consequences for noncompliance.

¶ 19 Therefore we must balance the public policy expressed in the Act against the countervailing policy of enforcing contractual agreements. The parties acknowledge that prior to the Act, an unincorporated association was legally incapable of owning property in its own name. *Chicago Grain Trimmers Ass'n v. Murphy*, 389 Ill. 102, 107 (1945). Defendants argue that "the Act is expressly designed to authorize unincorporated associations to enter into real estate contracts where they otherwise would be without the power to do so under common law." Defendants further contend that the Act provides important protections to association members who are liable for the debts and liabilities of the association. Defendants, however, cite no authority to support their position that our legislature intended to provide those protections, as opposed to simply enabling unincorporated associations to execute or receive conveyances of real estate in the name of the association. We find nothing in the language of the Act that suggests that the legislature intended to remedy existing problems with the manner in which unincorporated associations owned, leased, or conveyed real property. Instead, a plain reading of the Act indicates that the legislature intended to empower unincorporated associations to execute or receive conveyances of real property in the association's name, and made no statement as to the effect of noncompliance with the notice or signatory provisions of the Act. As such we see no sound reason to exempt an unincorporated association from ordinary public policy considerations favoring enforcement of contracts or from general contract principles.

¶ 20 "Traditionally, and in keeping with the principle of freedom of contract, this court has been reluctant to declare a private contract as void as contrary to public policy." *Vine Street Clinic v. HealthLink, Inc.*, 222 Ill. 2d 276, 299 (2006) (citing *H&M Commercial Driver Leasing, Inc. v. Fox Valley Containers, Inc.*, 209 Ill. 2d 52, 57 (2004)). Our supreme court has long held that:

> " 'In considering whether any contract is against public policy it should be remembered that it is to the interests of the public that persons should not be unnecessarily restricted in their freedom to make their own contracts. Agreements are not held to be void, as being contrary to public policy, unless they be clearly contrary to what the constitution, the statutes or the decisions of the courts have declared to be the public policy or unless they be manifestly injurious to the public welfare.' " *Id.* at 300 (quoting *Schumann-Heink v. Folsom*, 328 Ill. 321, 330 (1927)).

¶ 21 Here, we find nothing expressed in the Act that would lead us to conclude that the public policy embodied in the Act (an association's ability to own and convey real estate in its own name) outweighs our state's preferred policy of enforcing otherwise legal private contracts entered into for legitimate purposes. There is nothing in this transaction that dictates a conclusion that enforcing the LPA results in manifest injury to the public welfare and should be declared void *ab initio*. Therefore, we find that an unincorporated association's failure to comply with Act when executing or conveying an interest in real property does not, on its own, render the contract void *ab initio*.

¶ 22 We further find that *Alliance* is distinguishable. There, the question was whether a condominium board could enter into a 36-month management contract when the condominium

association's governing documents only permitted the board to enter into contracts for 24 months or less. *Alliance*, 2015 IL App (1st) 150169, ¶ 26. We found that the management contract was void because the board lacked authority to enter into the agreement: the Condominium Property Act required the board to comply with its own bylaws, and the board had no authority to disregard the plain language of its governing documents. *Id.* ¶¶ 30-33. The primary distinction between *Alliance* and the situation before us is that the bylaws in *Alliance* specifically prohibited the board from entering into a 36-month management contract, rendering the management contract void *ab initio*. Here, nothing in Local 726's bylaws prohibited it from entering into lease or purchase agreements generally, and defendants make no argument that the LPA contained terms that were specifically prohibited by Local 726's governing documents. As we discussed, Local 726's failure to comply with the Act does not, on its own, render the LPA void. Similarly, the failure of Local 726 to comply with the notice, membership authorization, and signatory provisions of its bylaws do not render the agreement void *ab initio*, especially where there is no evidence that Local 726 ever sought membership approval for any earlier lease, or that it ever complied with the two officer signature requirement. We therefore conclude that the LPA is not void *ab initio* by virtue of Local 726's failure to comply with the Act or its bylaws.

¶ 23                                    2. Clair's Authority to Enter Into the LPA

¶ 24        Next, defendants argue that, even if the LPA was not void *ab initio*, the LPA is unenforceable because Clair lacked actual or apparent authority to enter into the LPA on his own. Defendants assert that the circuit court found that "although [p]laintiff may have 'received' a copy of the Local's bylaws, the [d]efendants have not shown that [p]laintiff had actual knowledge of the provision regarding lease authorization." Defendants contend that the circuit court's finding that Clair had apparent authority to enter into the LPA was erroneous because plaintiff had a duty to investigate the scope of Clair's authority, and the circuit court improperly "placed the burden on [d]efendants to prove that they took adequate steps to equip [plaintiff] with actual knowledge that Clair lacked express authority to enter into the LPA."

¶ 25        Plaintiff responds in part by arguing that Clair had authority to make contracts on behalf of Local 726 because he was Local 726's principal officer, and therefore plaintiff was dealing with Clair as a principal, not as an agent.

¶ 26        It has long been recognized that "a corporation acts through its president, and through him executes its contracts and agreements, and an act pertaining to the business of the corporation, not clearly foreign to the general power of the president, done through him, will, in the absence of proof to the contrary, be presumed to have been authorized to be done by the corporate body." *Bank of Minneapolis v. Griffin*, 168 Ill. 314, 317 (1897). "As a general rule a party dealing with the president of a corporation is entitled to assume that he has authority to make contracts for the corporation which are within the scope of its corporate powers and which do not violate any statute or rule of public policy." *Vulcan Corp. v. Cobden Machine Works*, 336 Ill. App. 394, 400 (1949). However, it has also been long held that when a party challenges a president's authority to enter into the contract, then it is "necessary to go beyond the mere fact of the execution of the instrument and prove the authority of the agent to execute the same." *George E. Lloyd & Co. v. Matthews*, 223 Ill. 477, 480 (1906).

¶ 27        Here, Clair was Local 726's secretary-treasurer and its principal officer. Local 726's bylaws vested Clair with authority to "supervise, conduct and control all of the business and

affairs of [Local 726], its officers and employees." The bylaws, however, required the signatures of both the secretary-treasurer and the president on all contracts, including leases, as well as notice and membership authorization in connection with the lease or purchase of real estate. It is undisputed that Clair believed that he had individual authority to execute the LPA and that he held himself out to plaintiff as having that authority. But under the terms of Local 726's bylaws, Clair did not possess either express or implied actual authority to individually execute the LPA on behalf of Local 726. We find that Clair lacked actual authority to bind Local 726 to the LPA.

¶ 28 We next consider whether there was sufficient evidence from which the circuit court could conclude that Clair acted with apparent authority. The question of whether an agency relationship exists and the scope of the purported agent's authority are questions of fact. *Thomas v. Weatherguard Construction Co.*, 2015 IL App (1st) 142785, ¶ 48. We review the circuit court's findings of fact under the manifest weight of the evidence standard. *Id.* A factual finding is against the manifest weight of the evidence only where the opposite result is clearly evident or where the factual finding is unreasonable, arbitrary, or not based on the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002).

¶ 29 We find that there is sufficient evidence in the record to support the circuit court's finding that Clair had apparent authority to enter into the LPA. We first note that defendants do not fully acknowledge the circuit court's factual findings regarding the plaintiff's knowledge of Clair's authority to enter into the LPA. The circuit court's written order states:

"In its post-judgment motion, Local 700 argues that the evidence at trial conclusively shows that [p]laintiff knew or had reason to know that Clair lacked authority to enter the lease. But, the evidence at trial was far from definitive. Friedman testified that he did not recall seeing the bylaws. Clair testified that he had no specific recollection of [Matthew Friedman, the sole member and co-manager of plaintiff] requesting a copy of the bylaws or of providing a copy of the bylaws to Friedman, [p]laintiff's other manager Mick Bess, or [p]laintiff's attorney. Clair testified that he might have given a copy of the bylaws to John Diaz, a member of Local 726 who was not [p]laintiff's representative. *The testimony did not convincingly establish that [p]laintiff received a copy of the bylaws, and that as a result, [p]laintiff knew or should have known that Clair did not have actual authority to enter into the lease on behalf of Local 726.*" (Emphasis added.)

¶ 30 A complete reading of the circuit court's factual findings shows that it found that defendants did not establish that Friedman knew, or was in possession of information that would indicate that he should have known, that Clair lacked actual authority to sign the LPA.

¶ 31 "Apparent authority is the authority that a reasonably prudent person would naturally suppose the agent to possess, given the words or conduct of the principal." *Siena at Old Orchard Condominium Ass'n v. Siena at Old Orchard, L.L.C.*, 2017 IL App (1st) 151846, ¶ 80 (citing *State Security Insurance Co. v. Burgos*, 145 Ill. 2d 423, 432 (1991)). " '[A]n agent may bind his principal by acts which the principal has not given him *actual* authority to perform, but which he *appears* authorized to perform.' " (Emphases in original.) *Loncarevic & Associates, Inc. v. Stanley Foam Corp.*, 2017 IL App (1st) 150690, ¶ 36 (quoting *Lundberg v. Church Farm, Inc.*, 151 Ill. App. 3d 452, 461 (1986)). "A principal that places an agent in a situation where the agent may be presumed to have authority to act is estopped as against a third party from denying the agent's apparent authority." *Weil, Freiburg & Thomas, P.C. v.*

*Sara Lee Corp.*, 218 Ill. App. 3d 383, 390 (1991). It is the words or conduct of the principal, not those of the alleged agent, which establish an agent's authority. *Wesly v. National Hemophilia Foundation*, 2017 IL App (3d) 160382, ¶ 40. Furthermore, "[w]here parties silently stand by and permit an agent to act [on] their behalf in dealing with another in a situation where the agent may be presumed to have authority, the parties are estopped from denying the agent's apparent authority as to third persons." *Mateyka v. Schroeder*, 152 Ill. App. 3d 854, 864 (1987).

¶ 32    At trial, Friedman testified that the renovation plans and estimated costs for the premises had been shared with Local 726 and that Local 726 approved the plans and costs before the LPA was executed. Friedman also testified that John Falzone (Local 726's president), Kenneth Brantley (Local 726's vice president), John Hurley (Local 726's recording secretary), and Michael Marcatante (a Local 726 trustee) all visited the property prior to the execution of the LPA. Clair and Diaz introduced Falzone, Brantley, Hurley, and Marcatante to Friedman as members of Local 726's executive board. Friedman testified that "[t]hey thought [the premises] was great, perfect fit. The only comment I got was the office manager needed an office in the front of the building, make sure that happens." Friedman stated that he met with Local 726 representatives approximately 15 to 20 times between the time Local 726 started looking for property and the execution of the LPA and that Clair was at most, but not all, of the meetings. Additionally, Clair testified that Local 726's executive board had already given him authorization and approval to sign the LPA. In light of all of the evidence, the circuit court, as the trier of fact, could reasonably conclude that Local 726 held Clair out as having the authority to sign the LPA, especially considering that a majority of Local 726's executive board visited the premises, made favorable statements, and continued to permit Clair to spearhead the effort to secure a new headquarters for Local 726.

¶ 33    Furthermore, we find that the LPA would be enforceable even if Clair lacked apparent authority to bind Local 726 because the executive board clearly intended to ratify the LPA. "Ratification of an unauthorized act is equivalent to an original authorization and confirms that which was originally unauthorized." *Yugoslav-American Cultural Center, Inc. v. Parkway Bank & Trust Co.*, 289 Ill. App. 3d 728, 738 (1997). "Since the rationale behind the doctrine of ratification is that the person ratifying obtains a benefit through the actions of someone who is acting in his behalf, then ratification will be found '[a]s long as the principal has full knowledge of the facts and has the choice of either accepting or rejecting the benefits of the transaction.' " *Id.* (quoting *Swader v. Golden Rule Insurance Co.*, 203 Ill. App. 3d 697, 704-05 (1990)).

¶ 34    Here, a majority of Local 726's executive board members signed a consent resolution on May 8, 2008, six days after Clair executed the LPA. The consent resolution specifically resolved that "[Local 726] ratifies the actions previously taken by the officers of [Local 726] or any one of them acting alone, in connection with the [LPA] and all actions taken incidental thereto pertaining to the [LPA]." It is clear that Local 726 intended to ratify the LPA. Although there is nothing in the record to suggest that the executive board gave notice to Local 726's members of the consent resolution or held a vote of its members to authorize the consent resolution, by executing and delivering the consent resolution to plaintiff, the executive board clearly purported to act on behalf of Local 726's members, specifically acknowledged the LPA, and resolved to be bound by it. Furthermore, Local 726 accepted the benefits of the LPA

by moving in to the premises and paying the monthly rent called for in the LPA until its dissolution.

¶ 35    Finally, as noted above, there was no evidence in the record that Local 726 ever enforced its own requirements that its members authorize a lease prior to execution or that Local 726's leases be signed by both the secretary-treasurer and president. Defendants make no argument that the members of Local 726 voiced any objection to or took any action to contest the actions of Clair or the executive board in order to avoid being bound by the LPA. Under all of these circumstances, we find that Local 726 held Clair out as having the authority to execute the LPA, and then ratified Clair's execution of the LPA on its behalf. Based on Local 726's conduct, plaintiff had no reason to believe that Clair lacked authority to bind Local 726 under the LPA, or that Local 726 did not intend to be bound by the LPA.

¶ 36    In sum, Local 726 entered into a valid and enforceable agreement with plaintiff. Local 726's executive board held Clair out as having the authority to execute the LPA on behalf of Local 726 and ratified the LPA. We conclude that Local 726 was bound by the terms of the LPA.

¶ 37                              B. Whether Local 700 Is Liable for a Breach of the LPA

¶ 38    Next, defendants argue that the circuit court erred in imposing successor liability on Local 700 for breach of the LPA. Defendants contend that the general rule is that an entity that purchases the assets of a company is not liable for the predecessor's liabilities unless an exception applies. Defendants argue that the *de facto* merger and "mere continuation" exceptions to the general rule do not apply here. Defendants contend that there was no continuity of ownership between Local 726 and Local 700 because labor unions do not have owners in the same way that corporations or other business entities do. Defendants further argue that Local 700's and Local 726's use of the term "merger" in certain internal audit and IRS filings were "used for descriptive purposes only and were not intended to convey that these entities had, in fact, merged." Defendants, however, do not address a letter from the International to Coli in which the International also referred to Local 700 as a "consolidation" of Local 726 and Local 714. Finally, defendants argue that there was no evidence that the International dissolved Local 726 to fraudulently escape Local 726's obligations.

¶ 39    "The doctrine of successor corporate nonliability provides that when a corporation purchases the assets of another corporation, the purchaser is generally not liable for the debts or liabilities of the seller." *Workforce Solutions v. Urban Services of America, Inc.*, 2012 IL App (1st) 111410, ¶ 86. Four exceptions, however, have been developed to protect the rights of corporate creditors following dissolution: " '(1) where there is an express or implied agreement of assumption [of liability]; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations.' " *Id.* (quoting *Pielet v. Pielet*, 407 Ill. App. 3d 474, 508 (2010)). Here, defendants essentially argue that successor liability cannot apply to labor unions on the basis of a *de facto* merger or under a "mere continuation" theory because there will never be continuity of ownership, since a labor union's members do not "own" the labor union in the same way that a corporation's shareholders "own" the corporation. The circuit court observed that "Illinois courts determine whether a successor entity constitutes a continuation by analyzing similarity in ownership of the two entities[, b]ut this type of analysis is not aptly transferable to

a labor union because it does not have 'owners' in the same way as a corporation or other business entity."

¶ 40      In *Vernon v. Schuster*, 179 Ill. 2d 338, 345 (1997), our supreme court discussed the rationale behind the "mere continuation" exception:

> " 'The exception is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of the reach of the predecessor's creditors. *** To allow the predecessor to escape liability by merely changing hats would amount to fraud. Thus, the underlying theory of the exception is that, if a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability.' " *Id.* at 346 (quoting *Baltimore Luggage Co. v. Holtzman*, 562 A.2d 1286, 1293 (Md. Ct. Spec. App. 1989)).

¶ 41      Although numerous Illinois courts have addressed successor liability for corporations, the parties have not identified, nor have we found, any Illinois decision that addresses successor liability for unincorporated associations. The circuit court therefore looked to federal law on the issue of successor liability in the context of labor union mergers. In *Equal Employment Opportunity Comm'n v. Local 638*, 700 F. Supp. 739 (S.D.N.Y. 1988), the federal district court had to determine whether Local 28 of the Sheet Metal Workers' International was the successor to Local 10 of the Sheet Metal Workers' International, and therefore whether Local 28 was liable for Local 10's violation of federal court orders prohibiting racial and ethnic discrimination. The federal district court discussed the principles of successorship in labor law and examined the relationship between the two unions (*id.* at 741-43): whether there was substantial continuity of the former Local 10 as merged into Local 28 (*id.* at 743-44) and whether Local 28 had notice, prior to the merger, of Local 10's general obligations and liabilities (*id.* at 744-45), and the federal policies at stake (*id.* at 745-46). The district court concluded that there was a merger and that Local 28 "inherited all assets, operations, records and property of Local 10, including over $200,000 in value, membership rolls, and collective bargaining agreements." *Id.* at 743. Furthermore, Local 28 absorbed all of Local 10's members. *Id.* There was evidence that Local 28 had pre-merger notice of Local 10's liabilities by virtue of an audit. *Id.* at 744. Finally, the district court found that respect for the federal courts and protections for employees were important federal policies that favored finding successor liability. *Id.* at 745-46.

¶ 42      We agree with the circuit court that the test employed in *Local 638* provides an appropriate framework for determining whether an unincorporated association, such as a labor union, may be liable under a theory of successor liability for the liabilities of a dissolved association. We find that the factors to be considered when determining successor liability of a dissolved association include: (1) the relationship between the dissolved and successor associations, (2) whether there was substantial continuity of the dissolved association after a merger or consolidation, (3) whether the successor association had notice of the dissolved association's liabilities, and (4) whether there are important state policies that would be affected by declining to impose successor liability. See also *Parker v. Metropolitan Transportation Authority*, 97 F. Supp. 2d 437 (S.D.N.Y. 2000) (adopting four-factor test set forth in *Local 638* for determining successor liability between labor unions).[3]

---

[3]We also believe that these factors are consistent with a number of factors used by the National Labor Relations Board when considering an employer's duty to bargain with a post-merger union. See,

¶ 43    Applying this framework, we find that the circuit court correctly concluded that Local 700 was liable for breach of the LPA under a theory of successor liability. First, the International consolidated the functions of Local 714 and Local 726 into Local 700 by simultaneously revoking the charters of Local 714 and Local 726 and issuing a new charter to Local 700. It is undisputed that C. Thomas Keegel, the International's secretary general, instructed Coli, trustee of Local 700, that Local 700 "will be structured as a consolidation of former [Local 714] and [Local 726]." There was evidence that the International simultaneously dissolved Local 714 and Local 726 and created Local 700 so that Local 700 would acquire and continue the dissolved locals' operations. Although defendants claim that there was no merger and that the use of the terms "merger" and "consolidation" were merely for "descriptive purposes," defendants cannot escape the common sense conclusion that the practical effect of the International's actions was to consolidate Local 726's (and part of Local 714's) membership, operations, functions, and duties and transfer those membership, operations, functions, and duties to the newly-chartered Local 700.

¶ 44    Second, there was sufficient evidence that there was substantial continuity of Local 726's operations, identity, and functions when it merged into Local 700. The International transferred all of Local 726's members, books, documents, property, and funds to Local 700. Local 700 obtained all of Local 726's assets, including cash, automobiles, office equipment, and furniture, and liabilities consisting of payroll liabilities, loans due to former officers, scholarship commitments, and automobile loans. Importantly, Local 726 was the exclusive collective bargaining representative for public sector employees in certain collective bargaining units. Upon revocation of the charter, the International transferred Local 726's collective bargaining agreements to Local 700, and Local 700 assumed responsibility as the exclusive representative for the affected bargaining units, an integral and essential function previously held by Local 726. Furthermore, Local 700 informed plaintiff that as of January 1, 2010, the day after Local 726 was dissolved, that Local 700 "[had] taken possession of, and has occupied the [p]remises," and tendered the rent due under the LPA (which plaintiff did not accept). Finally, there was testimony suggesting that after January 1, 2010, Local 700 would have acted as the collective bargaining representative under any of former Local 726's collective bargaining agreements, even though Local 700 waited until March 2010 to file petitions before the Illinois Labor Relations Board seeking formal recognition as the authorized collective bargaining representative under former Local 726's collective bargaining agreements. Not only had Local 700 absorbed Local 726's business operations, assets, and liabilities and become the successor representative of the public sector employees covered in collective bargaining units negotiated by Local 726, Local 700 occupied the very office space that Local 726 had occupied under the LPA. There was sufficient evidence before the circuit court to establish a substantial continuity of Local 726's operations, identity, and functions after it merged into Local 700.

---

e.g., *May Department Stores Co., Venture Stores Division v. National Labor Relations Board*, 897 F.2d 221, 228 (7th Cir. 1990) (observing that the Board compares pre- and post-merger unions for continuity by looking to the "structure, administration, officers, assets, membership, autonomy, by-laws, size, and territorial jurisdiction, [citation] with an eye toward changes in the rights and obligations of the union's leadership and membership, and in the relationships between the putative bargaining agent, its affiliate, and the employer" (internal quotation marks omitted)).

¶ 45    Third, there is no dispute that those responsible for creating Local 700 and Local 700's trustee had notice of Local 726's obligations under the LPA at the time of the International's self-described "merger" and "consolidation" in December 2009. There was evidence that the LPA was given to JC25 as part of its investigation into Local 726 in May 2008. Strzechowski testified at the International's September 17, 2009, hearing that the LPA imposed "a multi-million dollar liability on Local 726 that will inevitably bankrupt this Local unless some other means is found to avoid this crushing financial burden." The International's November 2009 report and recommendation regarding the continuation of Local 726's trusteeship called the LPA "an unconscionable and unauthorized lease-purchase agreement for a building which imposes a multi[-]million dollar liability that the Local cannot afford and which exceeds the fair market value of the building." Clearly, the record contains abundant evidence that the authorized entities involved in the investigation, revocation, and dissolution of Local 726 and the simultaneous creation of successor Local 700 were keenly aware of the LPA and Local 726's obligations under it.

¶ 46    Finally, we find that there are important state interests that favor finding that Local 700 was the successor to Local 726's obligations under the LPA. As discussed, our state's public policy strongly favors enforcement of private contracts. Allowing an unincorporated labor association to avoid its obligations under an enforceable contract through the International's dissolution and simultaneous transfer of the local's entire operation to a newly-chartered local operating under the same International umbrella, would eviscerate the integrity and purpose of contracting, would provide unincorporated associations an escape valve unknown to established contract law, and would serve no legitimate commercial purpose.

¶ 47    We find that there was an adequate basis for the circuit court to conclude that Local 700 was the successor to Local 726 and, therefore, liable for breach of the LPA. The circuit court properly entered judgment in favor of plaintiff on count I because the LPA was a valid and enforceable contract and Local 700 was liable under a theory of successor liability.

¶ 48                    C. The Uniform Fraudulent Transfer Act

¶ 49    The circuit court found, in the alternative, that Local 700 was liable to plaintiff because Local 726 fraudulently transferred its assets, including its CBAs, to Local 700 for no value. The circuit court found that "Local 726's assets were intentionally transferred to Local 700 to avoid Local 726's obligations under the [LPA]." The circuit court further found that "Local 726 had been considering renegotiation, litigation, or bankruptcy to avoid the [LPA] debt for some time." The circuit court observed that Coli recommended dissolving Local 726 and forming Local 700. Furthermore, the circuit court found that "Strzechowski, with full knowledge of [Local 726's] pending dissolution, continued to negotiate with [p]laintiff for lease end dates well past when Local 726 would be dissolved." Upon dissolution of Local 726, Coli became the trustee of Local 700 and "transferred all of Local 726's assets, including cash, furniture, and CBAs, to Local 700, while deliberately rejecting the lease agreement." The circuit court further found that "the value of [a CBA] *** is found in the 'mandatory' union dues which the Local receives. Much like accounts receivable, union dues are convertible to cash at future dates and are assets with significant value that can be transferred."

¶ 50    On appeal, defendants argue that the circuit court erred by finding that a CBA is a transferable asset for the purposes of the Fraudulent Transfer Act (740 ILCS 160/1 (West 2014)). Defendants argue that Local 726's CBAs were not assets that could be transferred.

- 13 -

Defendants contend that under the Illinois Public Labor Relations Act, public sector members of Local 726 have "the right of self-organization, and may form, join or assist any labor organization, [and] to bargain collectively through representatives of their own choosing." 5 ILCS 315/6(a) (West 2014). Defendants argue that union dues and fair share payments "shall be paid to the exclusive representative" chosen by the union members (5 ILCS 315/6(f) (West 2014)), and therefore the payment of dues is subject to the election of the union's members. Defendants contend that unions have no right to the receipt of union dues, and therefore Local 726 could not transfer any right to its members' union dues to Local 700. Defendants cite *In re General Teamsters, Warehousemen & Helpers Union Local 890*, 225 B.R. 719 (Bankr. N.D. Cal. 1998), to argue that CBAs do not entitle a union to the receipt of any union dues or any money.

¶ 51 Plaintiff responds that, regardless of the voluntary nature of a union member's membership in a local union, here, "well over 95% of the Local 726 members in fact became Local 700 members and, as of January 1, 2010, paid their dues to Local 700." Plaintiff contends that Hoffa testified at trial that union dues were mandatory for members if those members wished to have the union represent them under the CBAs. Plaintiff asserts that Local 700 received value from Local 726 in the form of union dues paid by former members of Local 726.

¶ 52 "The Uniform Fraudulent Transfer Act was enacted to enable a creditor to defeat a debtor's transfer of assets to which the creditor was entitled." *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 16; 740 ILCS 160/5 (West 2008); see also *Rush University Medical Center v. Sessions*, 2012 IL 112906, ¶ 20. "The purpose of the [Fraudulent Transfer] Act is to 'invalidate otherwise sanctioned transactions made with a fraudulent intent.' " *Sharif*, 2014 IL App (1st) 133008, ¶ 16 (quoting *In re Marriage of Del Giudice*, 287 Ill. App. 3d 215, 218 (1997)).

¶ 53 Section 2(b) of the Fraudulent Transfer Act defines "asset" as the "property of a debtor," except for certain exclusions that do not apply here.[4] 740 ILCS 160/2(b) (West 2014). "Debtor" is defined as "a person who is liable on a claim." 740 ILCS 160/2(f) (West 2014). "Property" is broadly defined as "anything that may be the subject of ownership." 740 ILCS 160/2(j) (West 2014).

¶ 54 Under section 5(a) of the Fraudulent Transfer Act:

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

---

[4]Property excluded from the definition of "asset" includes "(1) property to the extent it is encumbered by a valid lien; (2) property to the extent it is generally exempt under laws of this State; or (3) an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant." 740 ILCS 160/2(b)(1)-(3) (West 2014).

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." 740 ILCS 160/5(a) (West 2014).

¶ 55    Section 6(a) of the Fraudulent Transfer Act provides:

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 740 ILCS 160/6(a) (West 2014).

¶ 56    When a transfer is voidable under the Fraudulent Transfer Act, "the creditor may recover judgment for the value of the asset transferred *** or the amount necessary to satisfy the creditor's claim, whichever is less." 740 ILCS 160/9(b) (West 2014). The creditor may obtain a judgment against "(1) the first transferee of the asset or the person for whose benefit the transfer was made; or (2) any subsequent transferee other than a good-faith transferee who took for value or from any subsequent transferee." 740 ILCS 160/9(b)(1)-(2) (West 2014). Whether a CBA meets the definition of an "asset," or whether a "transfer" has occurred for the purposes of the Fraudulent Transfer Act, involve questions of statutory interpretation, which are questions of law reviewed *de novo*.

¶ 57    Neither party provides us with any argument as to whether a CBA satisfies the definition of "asset" under section 2 of the Fraudulent Transfer Act. Nor has either party directed our attention to any case law that addresses whether CBAs (and the dues that accrue to the exclusive bargaining agent as a result) are assets of a local union for purposes of the Fraudulent Transfer Act. Furthermore, the parties do not address other significant issues, such as whether this was a "transfer" by a "debtor" for the purposes of the Fraudulent Transfer Act, since it was the International, not Local 726, that dissolved Local 726 and transferred Local 726's membership, books, documents, property, and funds to Local 700. Nor do the parties address whether finding Local 700 liable under successor liability principles precludes a finding that Local 726's assets were fraudulently transferred to Local 700—in other words, if Local 700 absorbed Local 726 assets and liabilities, was there a "transfer" for the purposes of the Fraudulent Transfer Act where the transferee is already liable for the debts of the predecessor under principles of successor liability?

¶ 58    We find, under the circumstances of this case, that there was no "transfer" of an asset by a "debtor" as required to impose liability on Local 700 under the Fraudulent Transfer Act. First, as discussed above, the International decided to merge and consolidate Local 726 and Local 714 into new Local 700. There was no "transfer" for purposes of the Fraudulent Transfer Act because Local 700 absorbed all of Local 726's assets and liabilities. Second, even assuming that a transfer occurred, there was no transfer by a debtor because Local 726—the "debtor"—did not transfer any of its assets. Instead, the International, pursuant to its authority over its affiliated locals, transferred Local 726's assets and liabilities to Local 700 as part of its dissolution of Local 726 and consolidation with Local 714 into the newly chartered Local 700. Plaintiff does not contend that the International is liable under the Fraudulent Transfer Act, and as we discuss in more detail below, there was nothing improper about the International's deliberate decision to revoke Local 726's charter and issue a new charter to Local 700. Therefore, assuming *arguendo* that a transfer occurred, the transfer was not made by a debtor.

We conclude that, as a matter of law, under the circumstances before us, Local 700 was not liable to plaintiff under the Fraudulent Transfer Act.

¶ 59      Additionally, it is not clear that a CBA (and the future right to collect dues that accrue to the exclusive bargaining agent as a result) is an "asset" for the purposes of the Fraudulent Transfer Act. We find *In re General Teamsters, Warehousemen & Helpers Union Local 890*, 225 B.R. 719 (Bankr. N.D. Cal. 1998), informative. *Local 890* involved a creditor's objection to Local 890's reorganization plan under chapter 11 of the Bankruptcy Code. The creditor argued that Local 890's plan was noncompliant with the Bankruptcy Code because the membership dues to which Local 890 was entitled under its CBAs should have been included in the liquidation analysis. *Id.* at 733. The bankruptcy court rejected the creditor's argument for a variety of reasons and found that the chapter 7 liquidation value of the CBAs was zero. First, the CBAs could not be enforced by Local 890 against any member and thus had questionable economic value to Local 890. *Id.* Second, although the court acknowledged that the CBAs were "property of the debtor's bankruptcy estate under 11 U.S.C. § 541(a) [(1994)]," the CBAs were not capable of liquidation under chapter 7—the chapter 7 trustee would have been responsible for operating Local 890's business, but federal labor law protected the union members' right to elect their own representatives. *Id.* at 734. The trustee, therefore, could only operate Local 890 if the members consented. The same would be true if the trustee attempted to sell or transfer the collective bargaining rights to a third party. *Id.*

¶ 60      *Local 890* casts substantial doubt on whether a CBA is an "asset" of a dissolved unincorporated union for purposes of the Fraudulent Transfer Act because it calls into question whether a CBA is an asset that can be transferred and, if a CBA can be transferred, whether the dues that accrue to the exclusive bargaining agent in the future have value for creditors. *Local 890* holds that a CBA is "property" of the debtor's estate under bankruptcy law, but it is incapable of valuation. A bargaining agent may hold legal title to a CBA but equitable title lies with the bargaining unit members. In other words, dues that accrue to the exclusive bargaining agent under a CBA are, on their own, an insufficient basis for valuation because the members control and select the bargaining agent. And furthermore, a CBA cannot be conveyed by the bargaining representative because the members dictate who their representative is and would not be obligated to recognize a transferee as their bargaining representative. *Local 890*, however, does not squarely address the situation here, where the issue is not whether a CBA is capable of being liquidated for value for the benefit of creditors, but instead whether the dues that accrue to the exclusive bargaining agent in the future should be considered when determining the value of a transferred asset for the purposes of the Fraudulent Transfer Act.

¶ 61      But, even assuming that a CBA (and the right to future dues) is a transferable asset under the Fraudulent Transfer Act, we would still conclude that Local 700 is not liable to plaintiff under the Fraudulent Transfer Act because there is no evidence that plaintiff actually proved the value of the CBAs at issue here. Plaintiff does not direct our attention to any evidence to support a conclusion that plaintiff proved the value of the CBAs at trial. Under the Fraudulent Transfer Act, a creditor is entitled to a judgment against a debtor's transferee for the lesser of the value of asset transferred or the amount necessary to satisfy the claim. Here, plaintiff presented no evidence, and the circuit court made no finding, as to the precise value that should be placed on any or all of the CBAs that Local 726 was a party to and that were absorbed by Local 700. In the circuit court, the parties addressed the CBAs in a general fashion and referred to them as "assets," but there was no evidence presented at trial as to the number of CBAs

Local 726 was a party to, the number of members in any related bargaining unit, or the term of any CBA. The mere fact that a CBA may generate some corresponding future dues payment does not, in itself, provide evidence of value or lend itself to a reliable mathematical calculation sufficient to sustain a money judgment against the transferee. Here, the only "value" evidence relating to an asset transfer was an audit report stating that $47,883 in assets and $123,299 in liabilities were transferred from Local 726 to Local 700. And merely arguing that Local 700 received dues under CBAs negotiated by Local 726, provides nothing more than speculation and conjecture regarding the value of a CBA, if any. The possible receipt of dues in the future says nothing about the value of the purported asset transferred sometime in the past. Plaintiff did not prove the value of a transferrable asset at the time of transfer, which is required, to support a monetary judgment against the debtor's purported transferee under the Fraudulent Transfer Act.

¶ 62    In sum, the evidence does not support finding that the debtor, Local 726, fraudulently transferred assets where it was dissolved by the International and the International thereafter transferred the assets, liabilities, and functions of the dissolved local to a successor local union. And, under these facts, even assuming a fraudulent transfer, where there is a failure of proof regarding the value of the transferred asset a judgment against the debtor's transferee cannot stand. We therefore reverse the circuit court's judgments on counts II and III finding Local 700 liable to plaintiff under the Fraudulent Transfer Act. We further note that, as plaintiff acknowledged at oral argument, plaintiff suffers no prejudice since it pled its Fraudulent Transfer Act claims in the alternative to its now-affirmed successor liability claim against Local 700.

¶ 63                    D. Coli's Liability for Tortious Interference With the LPA

¶ 64    Next, defendants argue that the circuit court erred in finding Coli liable for tortious interference with the LPA. The circuit court found that the defendant Teamsters officers, in voting to dissolve Local 726, did so with limited to no knowledge of the LPA, and that this decision was privileged because these defendants had a fiduciary duty to act in the best interest of their members. The circuit court found, however, that Coli tortiously interfered with the LPA because he "orchestrated" a "scheme to defraud" plaintiff, evidenced by his involvement in all stages of Local 726's dissolution and his expressed refusal to perform under the LPA. Defendants contend that Coli could not have acted alone in dissolving Local 726, and that Coli did not induce the other International general executive board members to vote in favor of dissolution based on his own objections to the LPA. Defendants argue that Coli was appointed trustee of Local 700 after the International dissolved Local 726, so Coli's postdissolution conduct has no bearing on plaintiff's claim that he tortiously interfered with the LPA by causing the dissolution. Defendants further contend that Coli was justified in rejecting the LPA "given the questions surrounding its validity, the unfair burden it would impose on Local 700 members[,] *** and his obligation to act in the best interest of the members of Local 700."

¶ 65    To prevail on a claim of tortious interference with a contract, the plaintiff must plead and prove (1) the existence of a valid and enforceable contract between the plaintiff and another, (2) the defendant's awareness of this contractual relation, (3) the defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach by the other, caused by the defendant's wrongful conduct, and (5) damages. *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 154-55 (1989).

¶ 66    Defendants' arguments focus on whether Coli's conduct was privileged. When determining whether a defendant's inducement of a breach of contract was unjustified, Illinois courts "recognize a privilege *** where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights." *Id.* at 157. A common example of this privilege is where corporate officers and directors use their business judgment and discretion on behalf of a corporation. *Id.* The privilege does not, however, extend to conduct that is "totally unrelated or even antagonistic to the interest which gave rise to [the] privilege." *Id.* at 158. Whether a privilege exists is a question of law that we review *de novo*. See, *e.g.*, *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 25 (1993).

¶ 67    We find that Coli is entitled to the same privilege that the circuit court afforded the other defendant Teamsters officials. The circuit court found that Coli's conduct was not privileged, since he "orchestrated an unlawful act: a scheme to defraud a creditor." We disagree.

¶ 68    Regarding Coli's conduct before Local 726 was dissolved, the evidence showed that Coli was acting in his capacity as president of JC25 and as a member of the International's general executive board. In February 2008, the International, aware of Local 726's financial problems, tasked Coli with investigating the financial condition of Local 726 and reporting to the International the steps taken to correct any perceived irregularities. During his investigation, Coli worked with Clair to evaluate Local 726's finances and to implement cost-saving measures to save the Local. Although Coli knew that Clair had executed the LPA approximately one week earlier, he did not mention this in his May 14, 2008, letter to the International outlining reforms that Local 726 was implementing to improve its financial condition.

¶ 69    During this same period, Local 726 was also being investigated by the independent review board. The review board issued a report on July 20, 2009, that recommended placing Local 726 into trusteeship "because the Local is not being conducted in accordance with the International's Constitution and the Local's Bylaws and the Local has engaged in financial malpractice." The report did not mention the LPA. The review board found several instances where Local 726's officers were in breach of their fiduciary duties in connection with certain unauthorized loans from its pension fund. The review board also took issue with the officers' attempts to repay loans from the pension fund with the proceeds of personal loans secured by Local 726's assets, in violation of Local 726's bylaws; failures to keep proper records of meetings; and the failure to create reports accurately reflecting Local 726's financial condition. The report identified two occasions where Clair had "misled the International regarding steps the Local had taken to improve its financial affairs." Specifically, the report noted that Coli's May 14 letter stated that a reduction of officer and business agent salaries had been implemented, but that Clair had not in fact reduced those salaries. The report reflected additional reasons for imposing a trusteeship related to financial disclosures and numerous unauthorized waivers of membership dues.

¶ 70    A reading of the review board's report makes clear that as of July 2009, the International was aware of serious managerial and financial problems plaguing Local 726 resulting in the International imposing an emergency trusteeship in early August 2009. Strzechowski was appointed as Local 726's trustee. She immediately met with plaintiff to discuss the LPA, and addressed the LPA during the International's September 17, 2009, hearing on whether to continue Local 726's trusteeship. Strzechowski also discussed Local 726's mismanagement of

its pension fund and other financial improprieties. On November 23, 2009, the International's hearing board recommended continuing the trusteeship, finding that Local 726's "finances are in shambles, and significant liabilities that were never disclosed to the membership or to the International continued to be discovered, even after the emergency trusteeship was imposed." The LPA was just one of the many factors presented to the International's hearing board for its consideration.

¶ 71   The International's general executive board met from December 1 to December 3, 2009. Coli made a brief presentation but did not mention the LPA. The general executive board voted to revoke the charters of Local 714 and Local 726 and to form Local 700. The parties do not direct our attention to any transcript of that hearing, and other than presenting evidence of what Coli did not say, they do not provide us with a sufficient understanding of what the International considered prior to voting to dissolve Local 726. The circuit court found that the International's general executive board members had little to no knowledge of the LPA when they voted to dissolve Local 726. It is also undisputed that Coli was one of several members voting on the fate of Local 726.

¶ 72   Regarding Coli's postdissolution conduct, Coli was appointed trustee of Local 700 in January 2010. Shortly after Local 700's charter became effective he met with plaintiff and informed plaintiff that "he would do nothing for [plaintiff]," and rejected plaintiff's offer to sell the premises to Local 700 for cost. In April 2010, Coli moved Local 700 out of the premises and into a building owned by Local 727's pension fund. Coli and his son were officers of Local 727's pension fund.

¶ 73   Every action taken by Coli was done in his capacity as either an officer of the International, president of JC25, or as trustee of Local 700. Each action had a legitimate business purpose and was in furtherance of Coli's fiduciary duty as an International trustee, member of JC25, and as trustee of Local 700. Although the circuit court concluded that Coli orchestrated a scheme to defraud a creditor, there is no evidence that Coli alone had the power to place Local 726 under trusteeship, revoke its charter, and dissolve Local 726. Coli alone could not and did not transfer the local's functions to or charter Local 700. The circuit court found that actions taken by the defendant Teamsters officers were made with limited to no knowledge of the LPA, which can only be viewed as conclusive evidence that the International, in dissolving Local 726, acted with knowledge of serious problems facing Local 726 as a result of its leadership's "financial malpractice," including being a party to the LPA, and other repeated breaches of their fiduciary duties. It was the dissolution of Local 726 that caused Local 726 to breach the LPA. After dissolution, Coli, as trustee of Local 700, took the position that Local 700 did not enter into, and had no obligations under, the LPA. Although we have ruled Local 700 is liable as a successor entity, Coli's position was not tortious. The record does not support a conclusion that Coli's conduct was substantially different than that of the other defendant Teamsters officers. His conduct was in the exercise of his fiduciary duty and business judgment and therefore falls within the same privilege afforded the other defendant Teamsters officers. We therefore reverse the circuit court's judgment on count VIII finding that Coli was liable for tortiously interfering with the LPA.

¶ 74                                    E. Enforceability of Section 14(B)(i) of the LPA

¶ 75        Finally, defendants argue that the circuit court erred in calculating plaintiff's damages because section 14(B)(i) of the LPA contains an unenforceable liquidated damages provision. We disagree.

¶ 76        Section 2 of the LPA, titled "Rent," contains a formula for calculating the monthly rent: monthly rent was one-twelfth of the "Annual Base Rent," which equaled the product of the final development cost, $1,434,214, and 10.5%, for a first year base rent of $150,592. Annual Base Rent increased each year by 2% during the 15-year term of the LPA. Section 14(B) sets forth plaintiff's remedies in the event of the lessee's default. Section 14(B)(i) provided in part:

> "Landlord may terminate this Lease and the Term by giving Tenant written notice of Landlord's election to do so and the effective date thereof, in which event Landlord may forthwith repossess the Premises and be entitled to recover forthwith, in addition to any other sums or damages for which Tenant may be liable to Landlord, as liquidated damages, a sum of money equal to the value of the Rent provided to be paid by Tenant for the balance of the Term."

¶ 77        Section 14(B)(i) did not provide any method for calculating "the value of the Rent provided to be paid." Section 14(B)(ii) provided that plaintiff "may terminate the right of Tenant to possession without terminating this Lease" by giving written notice. Local 726 would then be obligated:

> "[T]o pay the present value of the rent (at the then current rates therefor) for the period from the date stated in the notice terminating possession to the Expiration Date (such present value to be computed on the basis of a per annum yield on U.S. Treasury obligations maturing closest to the Expiration Date calculated on the date specified in said notice) ***."

¶ 78        At trial, plaintiff called Michael Goldman, a certified public accountant and certified valuation analyst, to testify as an expert in the field of valuation. Goldman calculated the present value of the rent payments that would have been made under the LPA starting in June 2010 (the first month following plaintiff's termination of the LPA) through 2023. Goldman calculated the applicable discount rate to be applied to the monthly rent payments called for under the LPA by looking to the discount rate set forth in section 14(B)(ii). He concluded that the present value of the lost rent from June 2010 through the end of the lease term was $1,839,019. Goldman did not perform any lost profits analysis and only calculated the net present value of rent payments called for under the LPA.[5]

¶ 79        "Whether a contractual provision for damages is a valid liquidated damages provision or is an unenforceable penalty clause is a question of law that is reviewed *de novo*." *GK Development, Inc. v. Iowa Malls Financing Corp.*, 2013 IL App (1st) 112802, ¶ 44 (citing *Penske Truck Leasing Co. v. Chemetco, Inc.*, 311 Ill. App. 3d 447, 454 (2000)).

¶ 80        No fixed rule applies to all liquidated damages provisions, and courts must evaluate each one on its own facts and circumstances. *Karimi v. 401 North Wabash Venture, LLC*, 2011 IL App (1st) 102670, ¶ 16 (citing *Jameson Realty Group v. Kostiner*, 351 Ill. App. 3d 416, 423 (2004)). When a contract provision specifies damages, we must determine whether the

---

[5]Defendants raise no argument on appeal challenging Goldman's qualifications as an expert or the methods he employed in reaching his calculations.

provision amounts to an enforceable liquidated damages provision or an unenforceable penalty. *GK Development*, 2013 IL App (1st) 112802, ¶ 47 (citing *Checkers Eight Ltd. Partnership v. Hawkins*, 241 F.3d 558, 562 (7th Cir. 2001)). To make that determination, we are guided by section 356 of the Restatement (Second) of Contracts, which provides:

> "Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." Restatement (Second) of Contracts § 356 (1979).

¶ 81    Three elements must be present in order for a liquidated damages clause to be enforceable: "(1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove." (Internal quotation marks omitted.) *Jameson Realty Group*, 351 Ill. App. 3d at 423. We look to the time of contracting, not the time of the breach, to determine whether actual damages would be uncertain or difficult to prove. *Id.* A liquidated damages provision that operates as a penalty for nonperformance or as a threat to secure performance is unenforceable. *Id.*

¶ 82    Defendants first contend that section 14(B)(i) of the LPA serves no purpose other than to penalize nonperformance because it provides that in the event of a default, plaintiff is "entitled to recover forthwith, in addition to any other sums of damages for which Tenant may be liable to Landlord, as liquidated damages, a sum of money equal to the value of the Rent provided to be paid by Tenant for the balance of the Term." We disagree.

¶ 83    The plain language of section 14(B)(i) allows plaintiff to "recover forthwith, *in addition to any other sums or damages* for which Tenant may be liable to Landlord, as liquidated damages, a sum of money equal to the value of the Rent provided to be paid by Tenant for the balance of the Term." (Emphasis added.) The use of the phrase "in addition to any other sums or damages" means that the recoverable "sums or damages" under this provision are for losses incurred by plaintiff that were different or distinct from the loss caused by the nonpayment breach. The LPA contained several provisions under which Local 726 might owe plaintiff damages. Section 5(B), titled "Condition of Premises," included a provision that Local 726 "shall keep the [p]remises and all appurtenances in good repair in and clean and healthful condition *** at Tenant's expense." Section 7, titled "Alterations," provided that upon termination of the LPA term, either by a default or at the end of the lease term, plaintiff could direct Local 726 to remove all alterations or additions and return the premises in the same condition as at the commencement of the LPA, excepting ordinary wear and tear, "at Tenant's sole cost and expense." Section 17 provided that Local 726 would pay all attorney fees and costs incurred by plaintiff in enforcing the LPA. It is clear that section 14(B)(i)'s use of the phrase "in addition to any other sums or damages" sought to capture any sums or damages that Local 726 owed plaintiff under the LPA that would otherwise not be included in the liquidated damages provision. We find that section 14(B)(i) of the LPA did not enable plaintiff to recover actual damages from the breach in addition to liquidated damages.

¶ 84    Furthermore, we find that defendants' reliance on *H&M Driver Leasing Services, Unlimited, Inc. v. Champion International Corp.*, 181 Ill. App. 3d 28 (1989), unpersuasive. There, the parties entered into a contract whereby the plaintiff would lease truck drivers to the

defendant as needed. *Id.* at 30. The parties agreed that the defendant would not hire any of the plaintiff's drivers until at least one year after the agreement terminated. *Id.* The parties' contract provided that:

> "In the event that [defendant] does hire any of the drivers in violation of the terms of this Agreement, then [defendant] shall pay to [plaintiff] all costs and expenses, including attorney's fees incurred by [plaintiff] in enforcing the provisions of this Agreement including injunctive relief. [Defendant] also agrees to pay $10,000.00 liquidated damages to [plaintiff], *plus any and all actual damages resulting to [plaintiff]*." (Emphasis in original and internal quotation marks omitted.) *Id.*

¶ 85    We observed that the contract "expressly provided that the $10,000 'liquidated damages' was recoverable in addition to 'any and all actual damages' resulting from the breach," which "imposed a clear penalty which cannot be enforced." *Id.* at 31. There, the liquidated damages provision was unenforceable because it clearly sought to secure the defendant's performance and sought to provide plaintiff with actual damages for the breach in addition to a $10,000 penalty. Here, as we explained, section 14(B)(i) does not provide plaintiff with the right to recover actual damages for the breach in addition to a penalty.

¶ 86    Defendants further argue that the liquidated damages provision in section 14(B)(i) was not reasonable at the time of contracting and therefore does not bear a relation to the damages that plaintiff might sustain. Defendants contend that plaintiff's "actual damages" were the profits it expected to make under the LPA, which would have been the rental payments minus mortgage and real estate taxes, and which would not have been difficult to calculate at the time of contracting.

¶ 87    We again disagree. Although defendants argue that section 14(B)(i), at the time of contracting, did not bear any relation to damages plaintiff might sustain, defendants fail to explain what damages were foreseeable, or how those damages should be calculated. On appeal, defendants provide no citations to the record to show what plaintiff's "actual" damages were, and provide no argument as to what damages could have reasonably been anticipated at the time of contracting. Any argument that section 14(B)(i)'s "did not bear a relation to the damages plaintiff might sustain" requires some argument as to what plaintiff, at the time of contracting, could or should reasonably have expected damages to be. Nor have defendants advanced any developed argument supported by citations to the record that, at the time of contracting, the amount of plaintiff's actual damages would be certain or easy to prove. Obviously, if these damages were ascertainable and easy to prove the parties could have so provided in the agreement. Having failed to advance and develop any such argument, defendants have forfeited their substantive challenge to the enforceability of section 14(B)(i) of the LPA.

¶ 88    Forfeiture aside, the present value of future lost rent is an appropriate measurement of a commercial lessor's damages. Here, the LPA provided for monthly rent payments based on a formula designed to recoup plaintiff's initial development costs. The annual base rent comprised 10.5% of those development costs, increasing annually by 2%. Therefore, for plaintiff to recoup the initial development costs (irrespective of any unanticipated market forces) would take about 10 years of the LPA's 15-year term. The liquidated damages provision in part accounts for plaintiff's substantial initial development costs, and thus bears a reasonable relation to damages that plaintiff would sustain in the event of a breach. Additionally, assuming that a tenant vacates a leased premises, the landlord is still entitled to

rent under the terms of the lease, unless and until the landlord relets the premises, thus mitigating his damages. Here, at the time of contracting, the parties agreed to fix plaintiff's damages to the present value of the rent due, as of the date of the breach, for the remainder of the lease term. This is not unreasonable since, in the event of a breach, that is exactly what plaintiff would be entitled to. And in the event of a breach, the landlord's duty to mitigate damages would arise—either the tenant would be entitled to a setoff for any actual mitigation or the tenant would be absolved from paying damages if the landlord failed to take reasonable steps to mitigate. Nothing in the section 14(B)(i) damages provision precluded defendants from seeking such a setoff, and here, the circuit court specifically found plaintiff did attempt to mitigate damages. We find that the liquidated damages provision in section 14(B)(i) bore a reasonable relationship to the actual damages the plaintiff might sustain in the event of a breach. We affirm the circuit court's award of damages in favor of plaintiff.

¶ 89                                    CONCLUSION

¶ 90      For the foregoing reasons, we find that the LPA was a valid and enforceable agreement, and that Local 700 was liable to plaintiff for Local 726's breach of the LPA under a theory of successor liability. We therefore affirm the circuit court's judgment in favor of plaintiff on count I. We reverse the circuit court's Fraudulent Transfer Act judgments in favor of plaintiff on counts II and III because there was no transfer of an asset by a debtor within the meaning of the Fraudulent Transfer Act, and even if there was, plaintiff failed to prove the actual value of the CBAs at issue here. We reverse the circuit court's judgment in favor of plaintiff on counts II and III. We further find that Coli is not liable for tortious interference with the LPA because his conduct was privileged. The circuit court's judgment in favor of plaintiff and against Coli on count VIII of the complaint is reversed. Finally, section 14(B)(i) of the LPA is an enforceable liquidated damages provision, and the circuit court's damages award of $1,996,853, and for postjudgment interest and costs is affirmed.

¶ 91      Affirmed in part and reversed in part.